1

2

3

4

5

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

6

7

8

9

10

11

FEDERAL TRADE COMMISSION,

    Plaintiff,

v.

GRANT CONNECT, LLC, et al.,

    Defendants.

)
)
)
)
)
)
)
)
)
)
)
)

2:09-CV-01349-PMP-RJJ

PRELIMINARY INJUNCTION ORDER
AS TO DEFENDANTS MICHAEL L.
HENRIKSEN JR., TASHA JN PAUL,
KYLE KIMOTO, AND JOHNNIE
SMITH

12      Presently before the Court is Plaintiff Federal Trade Commission's ("FTC")

13  Emergency Motion for a Temporary Restraining Order and Preliminary Injunction as to

14  Additional Individual Defendants (Doc. #143) with supporting exhibits (Doc. #144, #145),

15  filed on May 14, 2010.  Defendant Johnnie Smith ("Smith") filed an Opposition (Doc.

16  #152) on May 27, 2010.  Defendant Michael L. Henriksen ("M. Henriksen") filed an

17  Opposition (Doc. #154) on May 27, 2010.  Defendant Kyle Kimoto ("K. Kimoto") did not

18  file a response to the motion, instead filing his own motion for summary judgment and/or to

19  dismiss (Doc. #155).  Defendant Tasha Jn Paul ("Jn Paul") did not file a response, but she

20  sent a letter to the FTC (Doc. #158, Decl. of Roberto Anguizola, Ex. 1), which the parties

21  have treated as her response.  Plaintiff FTC filed a Reply (Doc. #158) on June 7, 2010.  The

22  Court held a hearing on this matter on June 15, 2010.  (Mins. of Proceedings (Doc. #164).)

23                              **FINDINGS OF FACT**

24      The FTC filed this action on July 27, 2009, alleging Defendants Grant Connect,

25  LLC; Global Gold, Inc.; Horizon Holdings, LLC; O'Connell Gray, LLC; Pink LP; Vantex

26  Group, LLC; Vertek Group, LLC; Rachael A. Cook; James J. Gray; Steven R. Henriksen;

Juliette M. Kimoto; and Randy D. O'Connell (collectively "Original Defendants") deceptively marketed grant and credit line offers, failed to adequately disclose negative upsells and related monthly charges, and debited consumers' bank accounts on a recurring basis without obtaining written authorization. (Compl. (Doc. #1).) The FTC alleged the Original Defendants engaged in a common enterprise while engaging in these acts, and thus are jointly and severally liable. The FTC brings claims against Defendants for misrepresentation (count one); failure to disclose (count two); and unauthorized debiting of consumers' bank accounts (count three). The FTC seeks injunctive relief, including appointment of a receiver and asset freezes, and equitable relief to redress consumer injury, including restitution and disgorgement.

On July 28, 2009, the Court granted a Temporary Restraining Order ("TRO") (Doc. #18) against the Original Defendants. The TRO included prohibitions on certain conduct, froze Original Defendants' assets, and appointed Robb Evans as temporary receiver. On August 14, 2009, the FTC and Defendants Grant Connect, LLC; Horizon Holdings, LLC; O'Connell Gray, LLC; James J. Gray; and Randy D. O'Connell stipulated to the entry of a preliminary injunction (Doc. #44), which the Court granted on August 18, 2009 (Doc. #48). On September 22, 2009, the Court converted the TRO to a preliminary injunction (Doc. #83) as to Defendants Global Gold, Inc.; Pink LP; Vantex Group, LLC; Vertek Group, LLC, Rachael A. Cook; Steven R. Henriksen; and Juliette M. Kimoto. This Order hereby incorporates the findings of fact and conclusions of law set forth in the prior preliminary injunction order.

In April 2010, the FTC amended the Complaint to add factual allegations regarding other allegedly fraudulent internet website offers, including offers related to work from home and the acai berry. The Amended Complaint (Doc. #112) added four new individual Defendants: M. Henriksen, Jn Paul, K. Kimoto, and Smith (collectively "Additional Individual Defendants"). The Amended Complaint also added fifteen new

corporate Defendants:  Acai, Inc.; AllClear Communications, Inc.; Consolidated Merchant Solutions, LLC; Dragon Group, Inc.; Elite Benefits, Inc.; Global Fulfillment Inc.; Global Gold Limited; Healthy Allure, Inc.; Juliette M. Kimoto Asset Protection Trust; MSC Online, Inc.; OS Marketing Group, LLC; Paid to Process, Inc.; Premier Plus Member, Inc.; Total Health, Inc.; and Vcomm, Inc.

It appears to the satisfaction of the Court, having considered the evidence presented by the parties, including the Amended Complaint, the Motions for Preliminary Injunction filed by Plaintiff, the declarations, exhibits, and memoranda of points and authorities filed in support thereof and in response thereto, that:

1.  This Court has jurisdiction over the subject matter of this case, and there is good cause to believe it will have jurisdiction over all parties hereto and that venue in this district is proper;

2.  There is good cause to believe that Additional Individual Defendants have engaged in and are likely to engage in acts and practices that violate Section 5(a) of the Federal Trade Commission Act, 15 U.S.C. § 45(a), Section 907(a) of the Electronic Funds Transfer Act, 15 U.S.C. §§ 1693e(a) ("EFTA"); and Section 205.10(b) of Regulation E, 12 C.F.R. § 205.10(b) ("Regulation E"), and the Commission is therefore likely to prevail on the merits of this action.  A practice is deceptive under the Federal Trade Commission Act "if it is likely to mislead consumers acting reasonably under the circumstances . . . in a way that is material."  F.T.C. v. Cyberspace.Com LLC, 453 F.3d 1196, 1199 (9th Cir. 2006).  "A solicitation may be likely to mislead by virtue of the net impression it creates even though the solicitation also contains truthful disclosures."  Id. at 1200.  While proof that consumers actually were deceived is not required, such evidence is "highly probative to show that a practice is likely to mislead consumers acting reasonably under the circumstances."  Id. at 1201.

a.  As set forth in the Court's prior preliminary injunction order (Doc. #83), the FTC is likely to prevail in showing the various offers were false or misleading.

b.  The FTC is likely to prevail in demonstrating the Additional Individual Defendants are liable under the Act.  An individual may be liable for injunctive relief under the Act for a corporation's deceptive practices "if the FTC can prove (1) that the corporation committed misrepresentations or omissions of a kind usually relied on by a reasonably prudent person, resulting in consumer injury, and (2) that [the individual] participated directly in the acts or practices or had authority to control them."  F.T.C. v. Publ'g Clearing House, Inc., 104 F.3d 1168, 1170-71 (9th Cir. 1997).  An individual is personally liable for a corporation's violations of the Act if (1) "he participated directly in the acts or practices or had authority to control them," and (2) "had actual knowledge of material misrepresentations, was recklessly indifferent to the truth or falsity of a misrepresentation, or had an awareness of a high probability of fraud along with an intentional avoidance of the truth."  Cyberspace.Com LLC, 453 F.3d at 1202.

i.  The FTC is likely to prevail in demonstrating Defendant Smith participated directly in the acts and practices of Vantex.  Vantex organization charts put Smith at the top of the chart and list him as Executive Director.  (Pl.'s Exs. 430, 517-19.)  This is confirmed by the declaration of Vantex owner Juliette Kimoto that while her husband, K. Kimoto, was preparing for trial, Smith "was placed in charge of the day-to-day business operations of Vantex."  (Pl.'s Reply (Doc. #158), Ex. 601.)  J. Kimoto's statement is supported by

the testimony of Vantex employee Matthew Dacko ("Dacko"), who indicated that Smith represented that Smith was in charge at Vantex, and by Vantex employee Rachel McKinnon ("McKinnon"), who testified that Smith was ranked higher than Defendant Jn Paul, who is Vantex's Operations Manager.  (Pl.'s Ex. 586 at 56, Ex. 587 at 170-71.)  Moreover, Smith's consulting agreement suggests he was more than a consultant.  (Smith Opp'n (Doc. #152), Ex. 2.)  The agreement gave Smith authority to perform a broad range of activities, provided for approximately $200,000 in compensation, and provided for Smith eventually to gain an ownership interest in Vantex.  (Id.)  Smith also agreed to a two-year covenant not to compete.  (Id.)

In addition to his title and place within Vantex's hierarchy, FTC has presented evidence that Smith was involved in Vantex's business practices.  Smith did not live in Las Vegas, and visited the Las Vegas office only sporadically.  (Pl.'s Ex. 586 at 57, Ex. 587 at 23-24.)  However, Smith was in daily contact with Jn Paul and received by email summaries of various corporate activities.  (Pl.'s Exs. 417, 422, 587 at 170-71.)  Testimony and email evidence demonstrates Smith was involved in such business affairs as deciding whether a new vendor would receive a new "skin," or offer; approving designs for new offers; recommending changes to the terms and conditions of the Global Gold offer; attempting to resolve a dispute between Jn Paul and an outside party regarding the amount of the "bounty" the third party would receive; directing Vantex employees as to the priority of certain offers; directing a

Vantex employee to develop a plan of action in conformity with his directions; and implementing a new pay increase policy. (Pl.'s Exs. 436, 495, 587 at 165-66, Ex. 591, Ex. 600, Ex. 608.)

The FTC also is likely to prevail in showing Smith had actual knowledge of the misrepresentations, or at least was recklessly indifferent. Vantex employee McKinnon testified that she advised another Vantex employee that she found a Vantex page that was not in compliance with regulatory requirements because it depicted President Obama and indicated the public could obtain free stimulus money. (Pl.'s Ex. 587 at 74-76.) That employee advised Jn Paul and Smith about the offending web page, but the page was not taken down immediately. (Id.) Smith was aware of actual complaints relating to the websites, as he was the recipient of an email indicating a publisher had submitted a Global Gold offer to his lawyer for review, and the lawyer indicated the offer lacked proper disclosures. (Pl.'s Ex. 457.) Smith also was copied on an email which indicated Global Gold had received a complaint from the Iowa Attorney General. (Pl.'s Ex. 539.) Additionally, Smith received an email detailing recent FTC cases, including cases in which the FTC pursued companies who failed "to disclose monthly recurring charges prior to purchase including negative option charges. This cannot be done by clicking on a link to view the terms and conditions." (Pl.'s Mot., Ex. 542.)

Further, Smith was included in email discussions regarding the fact that for four months Global Gold was incurring a high rate of customer chargebacks to their credit cards. (Pl.'s Exs. 536-37.)

Smith was involved in another email string in which M. Henriksen
questioned whether the refunds Vantex issued per cycle increased
due to customers "watching their bills" or was based on Vantex's
new partial refund policy which was initiated to "solve the
chargeback issue." (Pl.'s Ex. 592.) After the TRO was entered in
this case, Smith threw away a laptop because it contained
information he did not "want anyone trying to come here to use
against" him. (Smith Dep. (Doc. #162) at 99-100.)

Finally, Smith was a defendant in <u>FTC v. Capital Choice
Consumer Credit, Inc.</u> in relation to a shoppers club credit card
similar to the ones offered by Defendants in this case. (Pl.'s Ex.
598). The court in that case found Smith personally liable for the
telemarketing frauds committed in that case by various companies.
(<u>Id.</u> at 47-53.) Judgment was entered in that case in 2004. (<u>Id.</u>)
Moreover, Smith knew before he started working with Vantex that
K. Kimoto was under indictment for similar activity. (Smith Dep.
at 44-45.) Consequently, Smith should have been alert to the
possibility that similar claims in the Vantex/Global Gold offers
were misleading. Smith's alleged reliance on an attorney's opinion
letter on a single Global Gold offer does not insulate him from
individual liability. <u>Cyberspace.Com LLC</u>, 453 F.3d at 1202
("[R]eliance on advice of counsel [is] not a valid defense on the
question of knowledge required for individual liability.").
ii. The FTC is likely to prevail in demonstrating Defendant M.
Henriksen participated directly in the acts and practices of Vertek
and Vantex, and/or that he had the authority to control the acts and

practices of Vertek and Vantex employees.  A Vantex organization chart shows Henriksen as head of Vantex's accounting department. (Pl.'s Ex. 517.)  Juliette Kimoto avers that M. Henriksen was "responsible for the financial operations of Vantex and Vertek." (Pl.'s Ex. 601.)  Although listed as head of accounting, Dacko referred to M. Henriksen as the "boss," "pretty much the top guy," and "in charge."  (Pl.'s Ex. 586 at 53-54, 56.)  Other testimony indicates M. Henriksen had significant control over non-accounting issues.  Specifically, Smith identified M. Henriksen as one of only a few individuals who could terminate his employment with Vantex and as one of the top individuals at the company.  (Smith Dep. at 87, 137-38.)  Dacko also testified that M. Henriksen resolved a personnel issue within Vantex.  (Pl.'s Ex. 586 at 79-83.)  According to Smith, M. Henriksen demoted Jn Paul.  (Smith Dep. at 167-68.) M. Henriksen also was involved in the decision to spin off Vantex from Vertek, and was the person who announced the name change to the employees.  (Smith Dep. at 154-56; Pl.'s Ex. 586 at 68.)

In a May 2009 email, M. Henriksen lists "stuff [he] is watching over," and directs Steve Henriksen, Smith, Rachael Cook, and Josh Henriksen to "please read and pay attention to everything with your name on it."  (Pl.'s Ex. 558.)  Henriksen proceeded to give instructions regarding a variety of offers, including the grants and acai berry.  (Id.)  M. Henriksen contends that each of these matters related only to accounting, and thus the email does not show he had authority over the content of the offers.  Many of the areas covered by the email involve accounting, but other topical

areas include deciding whether to do a bonus sale for acai, getting articles of incorporation completed for two companies, drafting agreements that "look like a legal document" for servicing customers, and looking into the possibility of opening accounts in Panama to avoid chargebacks.  (Id.)

The FTC also is likely to prevail in showing M. Henriksen had actual knowledge of the misrepresentations, or at least was recklessly indifferent.  M. Henriksen was aware of actual complaints relating to the websites, as he was the recipient of an email indicating a publisher had submitted a Global Gold offer to his lawyer for review, and the lawyer indicated the offer lacked proper disclosures.  (Pl.'s Ex. 457.)  M. Henriksen also was copied on an email which indicated Global Gold had received a complaint from the Iowa Attorney General.  (Pl.'s Ex. 539.)  Additionally, M. Henriksen was a recipient of an email detailing recent FTC cases, including cases where the FTC pursued companies who failed "to disclose monthly recurring charges prior to purchase including negative option charges.  This cannot be done by clicking on a link to view the terms and conditions."  (Pl.'s Ex. 542.)  Finally, M. Henriken received an email by Steve Henriksen in which Steve Henriksen stated, "This is pretty funny . . . ."  (Pl.'s Ex. 529.)  Attached to the email is an internet website, wiki.answers.com, which refers to First National Gold, a Global Gold credit line offer, as fraudulent.  (Pl.'s Exs. 529, 530.)

Further, M. Henriksen was included in email discussions regarding the fact that for four months Global Gold was incurring a

9

high rate of customer chargebacks to their credit cards.  (Pl.'s Exs. 536-37.)  M. Henriksen questioned whether the refunds Vantex issued per cycle increased due to customers "watching their bills" or was based on Vantex's new partial refund policy which was initiated to "solve the chargeback issue."  (Pl.'s Ex. 592.)  Henriksen was aware of the hefty fines imposed by the Merchant Chargeback Monitoring Program due to the large amount of customer chargebacks.  (Pl.'s Exs. 554-56.)

Finally, Henriksen is under a stipulated injunction with the FTC in the <u>Assail</u> case restraining him from engaging in any telemarketing, and further prohibiting him from making certain representations related to credit card offers in connection with the offer of goods or services "by any means whatsoever."  (Pl.'s Ex. 597.)  M. Henriksen thus should have been alert to the issue of potential fraud in the various offers.

iii.  The FTC is likely to prevail in demonstrating Defendant K. Kimoto participated directly in the acts and practices of Vertek and Vantex, and/or had the authority to control the acts and practices of Vertek and Vantex employees.  The evidence presented shows K. Kimoto set up Vertek prior to his incarceration in relation to the <u>Assail</u> matter.  (Pl.'s Ex. 586 at 29-32.)  Defendants O'Connell and Gray aver that in late 2006 or early 2007, K. Kimoto contacted them to assist Global Gold with the logistics of accepting transactions over the internet.  (Pl.'s Exs. 56-66.)  O'Connell and Gray began providing services to Global Gold thereafter.  (<u>Id.</u>)  Afterwards, Kimoto "introduced" O'Connell and Gray to the grant

opportunity.  (Id.)  After further discussions with K. Kimoto, O'Connell and Gray agreed to work on the grant project which became Grant Connect.  (Id.)  In an email to a third party, Gray described K. Kimoto as heading up product development and publisher relations.  (Pl.'s Ex. 572.)

Smith testified at his deposition that K. Kimoto recruited him for employment at Vantex and negotiated the terms of Smith's agreement with Vantex.  (Smith Dep. at 37, 70-71, 74, 79-80, 136-37.)  Smith also identified K. Kimoto as someone who had authority at Vantex to terminate his employment.  (Id. at 87.)  K. Kimoto also had authority to grant or deny Jn Paul's requests for time off.  (Smith Dep. at 141-42.)  K. Kimoto participated in Vantex business affairs, such as a discussion regarding setting up merchant accounts and the decision to split up Vertek and Vantex.  (Pl.'s Ex. 576; Smith Dep. at 154-56.)  Vertek paid for thousands of dollars worth of jury and trial consultation for K. Kimoto.  (Pl.'s Exs. 269-70, 272.)

The FTC also is likely to prevail in showing K. Kimoto had actual knowledge of the misrepresentations, or at least was recklessly indifferent.  K. Kimoto was the originator of Grant Connect, which no one has attempted to defend as a legitimate product.  Around the time K. Kimoto was setting up Vantex and recruiting Smith to take over Vantex operations, K. Kimoto was facing criminal charges in relation to the Assail matter.  K. Kimoto therefore should have been alert to the possibility that similar offers made over the internet were false and/or misleading.

iv.  The FTC is likely to prevail in demonstrating Defendant Jn Paul participated directly in the acts and practices of Vertek and Vantex, and/or had the authority to control the acts and practices of Vertek and Vantex employees.  Jn Paul worked at Vantex as operations manager.  (Pl.'s Ex. 586 at 34, 76, Ex. 587 at 23-24.)  Dacko described her as a "boss," the one "running the show," and his "supervisor."  (Pl.'s Ex. 586 at 54, 59.)  K. Kimoto described Jn Paul to Smith as his "right hand man," and stated she "knows the operation inside out."  (Smith Dep. at 48.)  According to McKinnon, Jn Paul had authority to decide whether a new vendor would receive a new "skin," or offer.  (Pl.'s Ex. 587 at 165-66.)  Jn Paul also was involved in regular meetings regarding the business operations of the various offers.  (Pl.'s Exs. 422, 433-34, 461, 486-87, 507-08.)

The FTC also is likely to prevail in showing Jn Paul had actual knowledge of the misrepresentations, or at least was recklessly indifferent.  McKinnon testified that she advised another Vantex employee that she had found a Vantex page that was not in compliance because it showed President Obama and indicated the public could obtain free stimulus money.  (Pl.'s Ex. 587 at 74-76.)  That employee advised Jn Paul and Smith, but the page was not taken down immediately.  (Id.)  McKinnon also related that she advised Jn Paul some pages regarding the line of credit offers were not compliant, but Jn Paul told her not to change those pages.  (Pl.'s Ex. 587 at 100-02.)  Jn Paul was included on the above-referenced email strings regarding M. Henriksen's question as to wehther

refunds issued per cycle increased due to people "watching their bills" or was based on giving partial refund policy to "solve the chargeback issue."  (Pl.'s Ex. 536, 537.)  In her letter to the FTC, Jn Paul does not dispute she knew the offers were false or misleading. She argues only that she tried to be "as compliant as possible," and she was just "following orders."  (Pl.'s Reply, Decl. of Roberto Anguizola, Ex. 1.)

3.  There is good cause to believe that immediate and irreparable harm will result from Additional Individual Defendants' ongoing violations of the FTC Act, the EFTA, and Regulation E unless Additional Individual Defendants are restrained and enjoined by Order of this Court.  See United States v. Nutri-cology, Inc., 982 F.2d 394, 398 (9th Cir. 1992);

4.  There is good cause to believe that immediate and irreparable damage to this Court's ability to grant effective final relief for consumers, including monetary restitution, rescission or refunds, will occur from the sale, transfer, or other disposition or concealment by Additional Individual Defendants of their assets or records without an injunction;

5.  Good cause exists for (a) the freezing of the Additional Individual Defendants' assets and (b) ancillary relief;

6.  Weighing the equities and considering Plaintiff's likelihood of ultimate success on the merits, a preliminary injunction with an asset freeze and other equitable relief is in the public interest;

7.  Plaintiff FTC is an independent agency of the United States of America and no security is required of any agency of the United States for the issuance of a preliminary injunction.  Fed. R. Civ. P. 65(c).

///

**ORDER**

**<u>DEFINITIONS</u>**

For the purpose of this Preliminary Injunction ("Order"), the following definitions shall apply:

1.  "Additional Defendants" means Consolidated Merchant Solutions, LLC; OS Marketing Group, LLC; Acai, Inc.; Allclear Communications, Inc.; Dragon Group, Inc.; Elite Benefits, Inc.; Global Fulfillment, Inc.; Global Gold Limited; Healthy Allure, Inc.; MSC Online, Inc.; Paid To Process, Inc.; Premier Plus Member, Inc.; Total Health, Inc.; Vcomm, Inc.; Juliette M. Kimoto Asset Protection Trust; Michael L. Henriksen, Jr.; Tasha Jn Paul; Kyle R. Kimoto; and Johnnie Smith;

2.  "Additional Individual Defendants" means Michael Henriksen; Tasha Jn Paul; Kyle Kimoto; and Johnnie Smith.

3.  "Asset" means any legal or equitable interest in, right to, or claim to, any real, personal, or intellectual property including, but not limited to, chattel, goods, instruments, equipment, fixtures, general intangibles, effects, leaseholds, contracts, mail or other deliveries, shares or stock, securities, inventory, checks, notes, accounts, credits, receivables (as those terms are defined in the Uniform Commercial Code), cash, trusts, including but not limited to asset protection trusts, and reserve funds or other accounts associated with any payments processed on behalf of any Defendant, including, but not limited to, such reserve funds held by a payment processor, credit card processor, or bank.

4.  "Assisting others" includes knowingly providing any of the following goods or services to another entity: (1) performing customer service functions, including, but not limited to, charging consumers for products or services, or receiving or responding to consumer complaints; (2) formulating or providing, or

14

arranging for the formulation or provision of, any promotional material; (3) providing names of, or assisting in the generation of, potential customers; or (4) performing promotional or marketing services of any kind, including but not limited to, creating, hosting, or maintaining websites, or recruiting affiliates; or (5) processing credit and debit card payments.

5.  "Charge" means any amount charged or debited to a consumer's credit card, debit card, checking, savings, share or similar financial account, or collected from a consumer by any other method.

6.  "Clearly and Conspicuously"

    a.  with regard to print advertisements, solicitations, or other promotional material, the disclosure shall be in a type size and location sufficiently noticeable for an ordinary consumer to read and comprehend it, in print that contrasts with the background against which it appears; and in multi-page promotional materials, the disclosure shall appear on the cover or first page;

    b.  with regard to Internet advertisements, solicitations, or other promotional material, the disclosure shall be made next to any advertised price or cost (including free), and where consumers' financial account information is required, without the use of pop-up windows or hyperlinks to other electronic pages to display Material information.

7.  "Continuity Program" means any plan, arrangement, or system under which a consumer is periodically charged for products or services, including but not limited to access to a "member only" website, without prior notification by the seller before each charge, regardless of any trial or approval period allowing the consumer to cancel the program.

8.  "Corporate Defendants" means Grant Connect, LLC; Global Gold, Inc.;

Horizon Holdings, LLC; O'Connell Gray, LLC; Pink LP; Vantex Group, LLC; Vertek Group, LLC; Consolidated Merchant Solutions, LLC; OS Marketing Group, LLC; Acai, Inc.; AllClear Communications, Inc.; Dragon Group, Inc.; Elite Benefits, Inc.; Global Fulfillment, Inc.; Global Gold Limited; Healthy Allure, Inc.; MSC Online, Inc.; Paid To Process, Inc.; Premier Plus Member, Inc.; Total Health, Inc.; VComm, Inc.; Juliette M. Kimoto Asset Protection Trust; and their successors, assigns, affiliates or subsidiaries.

9.  "Defendants" means Grant Connect, LLC; Global Gold, Inc.; Horizon Holdings, LLC; O'Connell Gray, LLC; Pink LP; Vantex Group, LLC; Vertek Group, LLC; Rachael A. Cook; James J. Gray; Steven R. Henriksen; Juliette M. Kimoto; Randy D. O'Connell; Michael Henriksen; Tasha Jn Paul; Kyle Kimoto; Johnnie Smith; Acai, Inc.; AllClear Communications, Inc.; Consolidated Merchant Solutions, LLC; Dragon Group, Inc.; Elite Benefits, Inc.; Global Fulfillment Inc.; Global Gold Limited; Healthy Allure, Inc.; Juliette M. Kimoto Asset Protection Trust; MSC Online, Inc.; OS Marketing Group, LLC; Paid to Process, Inc.; Premier Plus Member, Inc.; Total Health, Inc.; and Vcomm, Inc.

10.  "Document" is synonymous in meaning and equal in scope to the usage of the term in the Federal Rules of Civil Procedure 34(a), and includes writing, drawings, graphs, charts, Internet sites, Web pages, Web sites, electronic correspondence, including e-mail and instant messages, photographs, audio and video recordings, contracts, accounting data, advertisements (including, but not limited to, advertisements placed on the World Wide Web), FTP Logs, Server Access Logs, USENET Newsgroup postings, World Wide Web pages, books, written or printed records, handwritten notes, telephone logs, telephone scripts, receipt books, ledgers, personal and business canceled checks and check registers, bank statements, appointment books, computer records, and other data

compilations from which information can be obtained and translated, if necessary, through detection devices into reasonably usable form. A draft or non-identical copy is a separate document within the meaning of the term.

11.  "Individual Defendants" means Rachael A. Cook; James J. Gray; Steven R. Henriksen; Juliette M. Kimoto; Randy D. O'Connell; Michael L. Henriksen, Jr.; Tasha Jn Paul; Kyle R. Kimoto; and Johnnie Smith.

12.  "Las Vegas Preliminary Injunction" means the preliminary injunction entered by the Court against Defendants Global Gold, Inc.; Pink LP; Vantex Group, LLC; Verterk Group, LLC; Rachael A. Cook; Steven R. Henriksen; and Juliette M. Kimoto on September 22, 2009 (Doc. #83).

13.  "Material" means likely to affect a person's choice of, or conduct regarding, goods or services;

14.  "Negative Option feature" means, in an offer or agreement to sell or provide any goods or services, a provision under which the customer's silence or failure to take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as acceptance of the offer;

15.  "Original Corporate Defendants" means Grant Connect, LLC; Global Gold, Inc.; Horizon Holdings, LLC; O'Connell Gray, LLC; Pink LP; Vantex Group, LLC; Vertek Group, LLC; and their successors, assigns, affiliates or subsidiaries.

16.  "Original Defendants" means Grant Connect, LLC; Horizon Holdings, LLC; O'Connell Gray, LLC; Global Gold, Inc.; Vantex Group, LLC; Vertek Group, LLC; Pink LP; Rachael A. Cook; James J. Gray; Steven R. Henriksen; Juliette M. Kimoto; and Randy D. O'Connell.

17.  "Person" means a natural person, organization, or other legal entity, including a corporation, partnership, proprietorship, association, cooperative, government or governmental subdivision or agency, or any other group or

17

combination acting as an entity;

18.  "Plaintiff" or "Commission" or "FTC" means the Federal Trade Commission;

19.  "Preauthorized Electronic Fund Transfer," as defined by the Electronic Fund Transfer Act, 15 U.S.C. § 1693a(9), means an electronic fund transfer authorized in advance to recur at substantially regular intervals.

20.  "Receiver" means the receiver appointed in Section XI of this Order and any deputy receivers that shall be named by the temporary receiver.

21.  "Receivership Defendants" means Grant Connect, LLC; Global Gold, Inc.; Horizon Holdings, LLC; O'Connell Gray, LLC; Pink LP; Vantex Group, LLC; Vertek Group, LLC; and their successors, assigns, affiliates or subsidiaries.

22.  "Reno Preliminary Injunction" means the stipulated preliminary injunction entered by the Court as to Defendants Grant Connect, LLC; Horizon Holdings, LLC; O'Connell Gray, LLC; James J. Gray; and Randy D. O'Connell on August 18, 2009 (Doc. #48).

23.  "Representatives" means Defendants' officers, agents, servants, employees, and attorneys, and any other person or entity in active concert or participation with them who receives actual notice of this Order by personal service or otherwise.

## I.

## PROHIBITED BUSINESS ACTIVITIES

**IT IS THEREFORE ORDERED** that, in connection with the advertising, marketing, promotion, offering for sale, or sale of any product or service, the Additional Individual Defendants and their Representatives, whether acting directly or through any entity, corporation, subsidiary, division, director, manager, member, affiliate, independent contractor, accountant, financial advisor, or other device, **are hereby preliminarily**

**restrained and enjoined from**:

    A.  Misrepresenting, directly or indirectly, expressly or by implication, or from assisting others who are misrepresenting, any consumer's eligibility to receive, or the likelihood of receiving, a grant or other financial assistance from the government or any other source;

    B.  Making any representation, expressly or by implication, concerning Defendants' success rate in securing grants or any person's likelihood of receiving a grant, unless Additional Individual Defendants possess and rely upon reliable evidence that substantiates the representation at the time the representation is made;

    C.  Failing to disclose, Clearly and Conspicuously, all applicable material terms regarding any and all products and services sold, marketed, promoted, or distributed by Defendants, including but not limited to:

        1.  all products and services that are part of the sales offer, including but not limited to, all goods and services provided by third parties and/or affiliates;

        2.  all Continuity Programs associated with the sales offer;

        3.  in conjunction with any Continuity Program:

            a.  that consumers are signing up for a Continuity Program;

            b.  the length of any trial period;

            c.  that consumers who do not take affirmative action to cancel the Continuity Program within the trial period will incur a Charge by Defendants;

            d.  the Charge(s) that Defendants impose on consumers who do not cancel within the trial period, and the date(s) the Charge(s) will be submitted for payment; and

e.  the specific steps consumers must follow to cancel enrollment in

all Continuity Programs to avoid incurring any Charge;

4.  any other Negative Option feature of any product or service that is part

of the sales offer;

5.  the amount of all Charges for all products and services that are part of

the sales offer, including but not limited to, any Continuity Program, and

goods and services provided by third parties; and

6.  Defendants' refund policy.

D.  Continuing to charge the credit card of any consumer for the purchase of

Defendants' grant-related publications, products, goods, services, or programs;

E.  Charging the credit or debit card, or debiting the bank account, of any

consumer who was enrolled in any Continuity Program without receiving clear

and conspicuous disclosures, as described in this Section, of the material terms of

such program; and

F.  Misrepresenting, directly or indirectly, expressly or by implication, or from

knowingly assisting others who are misrepresenting, any other fact material to a

consumer's decision to purchase Defendants' products or services.

## II.

## ACTIVITIES PROHIBITED PURSUANT TO

## THE ELECTRONIC FUNDS TRANSFER ACT ("EFTA")

**IT IS FURTHER ORDERED** that Additional Individual Defendants and their

Representatives, whether acting directly or through any entity, corporation, subsidiary,

division, director, manager, member, affiliate, independent contractor, accountant, financial

advisor, or other device, **are hereby preliminarily restrained and enjoined from**:

A.  Failing to obtain written authorization for preauthorized Electronic Fund

Transfers from a consumer's account before initiating any Preauthorized Electronic Fund

Transfer, as required by Section 907(a) of EFTA, 15 U.S.C. § 1693e(a) and Section 205.10(b) of Regulation E, 12 C.F.R. § 205.10(b) as more fully set out in Section 205.10 of the Federal Reserve Board's Official Staff Commentary to Regulation E, 12 C.F.R. § 205, Supp. I; and

B.  Failing to provide a copy of a valid written authorization to the consumer for preauthorized Electronic Fund Transfers from a consumer's account, as required by Section 907(a) of EFTA, 15 U.S.C. § 1693e(a) and Section 205.10(b) of Regulation E, 12 C.F.R. § 205.10(b), as more fully set out in Section 205.10 of the Federal Reserve Board's Official Staff Commentary to Regulation E, 12 C.F.R. § 205, Supp. I.

## III.

## ASSET FREEZE

**IT IS FURTHER ORDERED** that Additional Individual Defendants and their Representatives, whether acting directly or through any entity, corporation, subsidiary, division, director, manager, member, affiliate, independent contractor, accountant, financial advisor, or other device, **are hereby preliminarily restrained and enjoined from**:

A.  Transferring, liquidating, converting, encumbering, pledging, loaning, selling, concealing, dissipating, disbursing, assigning, relinquishing, spending, withdrawing, granting a lien or security interest in, or otherwise disposing of any funds, real or personal property, accounts, contracts, shares of stock, lists of consumer names, or other assets, wherever located, including outside the United States, that are:

1.  owned or controlled, in whole or in part by any Defendant;

2.  held for the benefit of, directly or indirectly, any Defendant, in whole or in part;

3.  in the actual or constructive possession of any Defendant;

4.  held by an agent of any Defendant as a retainer for the agent's provision of services to Defendants; or

5.  owned or controlled by, or in the actual or constructive possession of or otherwise held for the benefit of, any corporation, partnership, asset protection trust, or other entity that is directly or indirectly owned, managed, controlled by any of the Defendants, or of which any Defendant is an Officer, Director, Member, or Manager.  This includes, but is not limited to, any assets held by, for, or subject to access by, any of the Defendants at any bank or savings and loan institution, or with any broker-dealer, escrow agent, title company, commodity trading company, precious metal dealer, or other financial institution or depository of any kind; or

6.  held in any account for which any Defendant is an authorized signor.

7.  This Order shall not preclude any Additional Individual Defendant from spending a maximum of $100 per day for living expenses from their personal funds.

8.  Additional Individual Defendants may seek relief from the asset freeze in relation to specified assets for good cause shown.

B.  Opening or causing to be opened, unless accompanied by Counsel for the Commission, any safe deposit boxes titled in the name of any Defendant, either individually or jointly, or subject to access by any Defendant;

C.  Obtaining a personal or secured loan encumbering the assets of any Defendant, or subject to access by any Defendant;

D.  Incurring liens or other encumbrances on real property, personal property, or other assets in the name, singly or jointly, of any Defendant or of any corporation, partnership, or other entity directly or indirectly owned, managed, or controlled by any Defendant; or

E.  Incurring charges or cash advances on any credit or bank card issued in the

name, individually or jointly, of any Corporate Defendant or any corporation, partnership, or other entity directly or indirectly owned, managed, or controlled by any Defendant or of which any Defendant is an Officer, Director, Member, or Manager.  This includes, but is not limited to, any corporate bank or credit card account for which any Additional Individual Defendant is an authorized signor.

**IT IS FURTHER ORDERED** that the assets affected by this Section shall include assets (a) existing as of the date this Order is entered, or (b) acquired by any Defendant following entry of this Order, if such assets are derived from any activity that is the subject of or is prohibited by this Order.

## IV.

## DUTIES OF ASSET HOLDERS

**IT IS FURTHER ORDERED** that any financial or brokerage institution, credit card processing company, payment processor, merchant bank, acquiring bank, business entity, or person served with a copy of this Order that (a) holds, controls, or maintains custody of any account or asset of any Additional Individual Defendant, (b) holds, controls, or maintains custody of any asset associated with credit or debit card charges made on behalf of Additional Individual Defendants, including but not limited to, reserve funds held by payment processors, or (c) that has held, controlled, or maintained custody of any such account or asset at any time since the date of entry of this Order shall:

A.  Hold and retain within its control and prohibit the withdrawal, removal, assignment, transfer, pledge, encumbrance, disbursement, dissipation, relinquishing, conversion, sale, or other disposal of any such asset except by further order of this Court;

B.  Deny any person, except the Receiver acting pursuant to Section XII of this Order, access to any safe deposit box that is:

1.  titled in the name of any Additional Individual Defendant, either individually or jointly; or

23

2.  otherwise subject to access by any Additional Individual Defendant;

C.  Unless already provided, provide the FTC's counsel, within ten (10) business days of receiving a copy of this Order, a sworn statement setting forth:

1.  the identification number of each account or asset:

a) titled in the name, individually or jointly, of any of the Additional Individual Defendants;

b) held on behalf of, or for the benefit of, any of Additional Individual; or

c) associated with credit or debit card charges made on behalf of Additional Individual Defendants;

2.  the balance of each such account, or a description of the nature and value of each such asset as of the close of business on the day on which this Order is served, and, if the account or other asset has been closed or removed, the date closed or removed, the total funds removed in order to close the account, and the name of the person or entity to whom such account or other asset was remitted; and

3.  the identification of any safe deposit box that is either titled in the name, individually or jointly, of any of the Additional Individual Defendants, or is otherwise subject to access by any of the Additional Individual Defendants; and

D.  Upon the request of the FTC, promptly provide the FTC with copies of all records or other documentation pertaining to such account or asset, including, but not limited to, originals or copies of account applications, account statements, signature cards, checks, drafts, deposit tickets, transfers to and from the accounts, including wire transfers and wire transfer instructions, all other debit and credit instruments or slips, currency transaction reports, 1099 forms, and safe deposit box logs.

## V.

## FINANCIAL STATEMENTS

**IT IS FURTHER ORDERED** that each Additional Individual Defendant, unless already provided, shall upon of entry of this Order prepare and deliver to Counsel for the Commission and to the Receiver completed financial statements on the forms attached to this Order as Attachment A (Financial Statement of Individual Defendant) for themselves individually, and Attachment B (Financial Statement of Corporate Defendant) for each business entity under which they conduct business or of which they are an officer, and for each trust for which any Defendant is a trustee. The financial statements shall be accurate as of the date of entry of this Order.  Each Additional Individual Defendant shall include in the financial statements a full accounting of all funds and assets, whether located inside or outside of the United States, that are: (a) titled in the name of such Additional Individual Defendant, jointly, severally, or individually; (b) held by any person or entity for the benefit of such Additional Individual Defendant; or (c) under the direct or indirect control of such Additional Individual Defendant.

## VI.

## REPATRIATION OF ASSETS AND DOCUMENTS

**IT IS FURTHER ORDERED** that upon entry of this Order, each Additional Individual Defendant shall:

A.  Provide the Commission and the Receiver with a full accounting of all funds, documents, and assets outside of the United States which are: (1) titled in the name, individually or jointly, of any Defendant; or (2) held by any person or entity for the benefit of any Defendant; or (3) under the direct or indirect control, whether jointly or singly, of any Defendant;

B.  Transfer to the territory of the United States and deliver to the Receiver all funds, documents, and assets located in foreign countries which are: (1) titled in the name

individually or jointly of any Additional Individual Defendant; or (2) held by any person or entity, for the benefit of any Additional Individual Defendant; or (3) under the direct or indirect control of any Additional Individual Defendant, whether jointly or singly;

C.  Provide the Commission access to all records of accounts or assets of any Additional Individual Defendant held by financial institutions located outside the territorial United States by signing the Consent to Release of Financial Records appended to this Order as Attachment C.

## VII.

## NONINTERFERENCE WITH REPATRIATION

**IT IS FURTHER ORDERED** that Additional Individual Defendants and their Representatives, whether acting directly or through any entity, corporation, subsidiary, division, director, manager, member, affiliate, independent contractor, accountant, financial advisor, or other device, are hereby preliminarily restrained and enjoined from taking any action, directly or indirectly, which may result in the encumbrance or dissipation of foreign assets, or in the hindrance of the repatriation required by Section VI of this Order, including, but not limited to:

A.  Sending any statement, letter, fax, email or wire transmission, or telephoning or engaging in any other act, directly or indirectly, that results in a determination by a foreign trustee or other entity that a "duress" event has occurred under the terms of a foreign trust agreement until such time that all assets have been fully repatriated pursuant to Section VI of this Order; or

B.  Notifying any trustee, protector or other agent of any foreign trust or other related entities of either the existence of this Order, or of the fact that repatriation is required pursuant to a court order, until such time that all assets have been fully repatriated pursuant to Section VI of this Order.

///

## VIII.

## CONSUMER CREDIT REPORTS

**IT IS FURTHER ORDERED** that pursuant to Section 604(1) of the Fair Credit Reporting Act, 15 U.S.C. § 1681b(1), any consumer reporting agency served with this Order shall promptly furnish consumer reports as requested concerning any Additional Individual Defendant to the counsel for the Commission.

## IX.

## PRESERVATION OF RECORDS

**IT IS FURTHER ORDERED** that Additional Individual Defendants and their Representatives, whether acting directly or through any entity, corporation, subsidiary, division, director, manager, member, affiliate, independent contractor, accountant, financial advisor, or other device, are hereby preliminarily restrained and enjoined from:

      A.  destroying, erasing, mutilating, concealing, altering, transferring, or otherwise disposing of, in any manner, directly or indirectly, documents that relate to the business, business practices, assets, or business or personal finances of any Defendant; and

      B.  Failing to create and maintain documents that, in reasonable detail, accurately, fairly, and completely reflect Additional Individual Defendants' incomes, disbursements, transactions, and use of money.

## X.

## PROHIBITION ON RELEASE OF CUSTOMER INFORMATION

## OR CUSTOMER LISTS

**IT IS FURTHER ORDERED** that the Additional Individual Defendants and their Representatives, whether acting directly or through any entity, corporation, subsidiary, division, director, manager, member, affiliate, independent contractor, accountant, financial advisor, or other device, are hereby preliminarily restrained and enjoined from selling, renting, leasing, transferring, or otherwise disclosing the name, address, telephone number,

credit card number, bank account number, email address, or other identifying information of any person who paid money to any Defendant for grant-related services, programs, or products or who were contacted or are on a list to be contacted by any of the Defendants; provided that the Additional Individual Defendants may disclose such identifying information to a law enforcement agency or as required by any law, regulation, or court order.

## XI.

### TRANSFER OF RECEIVERSHIP PROPERTY TO RECEIVER

**IT IS FURTHER ORDERED** that the Additional Individual Defendants, their Representatives, and any other person, with possession, custody or control of property of, or records relating to, the Receivership Defendants shall upon notice of this Order by personal service or otherwise immediately notify the Receiver of, and, upon receiving a request from the Receiver, immediately transfer or deliver to the Receiver possession, custody, and control of, the following:

    A.  All assets of the Receivership Defendants;

    B.  All documents of the Receivership Defendants, including, but not limited to, books and records of accounts, all financial and accounting records, balance sheets, income statements, bank records (including monthly statements, canceled checks, records of wire transfers, and check registers), client lists, title documents and other papers;

    C.  All computers and data in whatever form used to conduct the business of the Receivership Defendants;

    D.  All assets belonging to other persons or entities whose interests are now under the direction, possession, custody, or control of, the Receivership Defendants; and

    E.  All keys, codes, and passwords necessary to gain or to secure access to any assets or documents of the Receivership Defendants, including, but not limited to, access to their business premises, means of communication, accounts, computer systems,

or other property.  In the event that any person or entity fails to deliver or transfer any asset or otherwise fails to comply with any provision of this Section, the Receiver may file ex parte an Affidavit of Non-Compliance regarding the failure.  Upon filing of the affidavit, the Court may authorize, without additional process or demand, Writs of Possession or Sequestration or other equitable writs requested by the Receiver.  The writs shall authorize and direct the United States Marshal or any sheriff or deputy sheriff of any county, or any other federal or state law enforcement officer, to seize the asset, document, or other item covered by this Section and to deliver it to the Receiver.

## XII.

## PROVISION OF INFORMATION TO RECEIVER

**IT IS FURTHER ORDERED** that Additional Individual Defendants shall provide to the Receiver, immediately upon request, the following:

A.  A list of all assets and property, including accounts, of the Receivership Defendants that are held in any name other than the name of a Receivership Defendant, or by any person or entity other than a Receivership Defendant; and

B.  A list of all agents, employees, officers, servants or those persons in active concert and participation with the Additional Individual Defendants and Receivership Defendants, who have been associated or done business with the Receivership Defendants.

## XIII.

## COOPERATION WITH THE RECEIVER

**IT IS FURTHER ORDERED** that Additional Individual Defendants, their Representatives, and any other person served with a copy of this Order shall fully cooperate with and assist the Receiver in taking and maintaining possession, custody, or control of the assets of the Receivership Defendants.  This cooperation and assistance shall include, but not be limited to:  providing information to the Receiver that the Receiver deems necessary in order to exercise the authority and discharge the responsibilities of the Receiver under

this Order; providing any password required to access any computer, electronic file, or telephonic data in any medium; advising all persons who owe money to the Receivership Defendants that all debts should be paid directly to the Receiver; and transferring funds at the Receiver's direction and producing records related to the assets and sales of the Receivership Defendants.  The entities obligated to cooperate with the Receiver under this provision include, but are not limited to, banks, broker-dealers, savings and loans, escrow agents, title companies, commodity trading companies, precious metals dealers and other financial institutions and depositories of any kind, and all common carriers, third-party billing agents, including but not limited to, payment processors, and other telecommunications companies, that have transacted business with the Receivership Defendants.

## XIV.

### INTERFERENCE WITH THE RECEIVER

**IT IS FURTHER ORDERED** that Additional Individual Defendants and their Representatives, corporations, subsidiaries, divisions, or affiliates, are hereby restrained and enjoined from directly or indirectly:

A.  Interfering with the Receiver managing, or taking custody, control, or possession of, the assets or documents subject to this Receivership;

B.  Transacting any of the business of the Receivership Defendants;

C.  Transferring, receiving, altering, selling, encumbering, pledging, assigning, liquidating, or otherwise disposing of any assets owned, controlled, or in the possession or custody of, or in which an interest is held or claimed by, the Receivership Defendants, or the Receiver; and

D.  Refusing to cooperate with the Receiver or the Receiver's duly authorized agents in the exercise of their duties or authority under any order of this Court.

///

30

## XV.

## STAY OF ACTIONS AGAINST LAS VEGAS RECEIVERSHIP DEFENDANTS

**IT IS FURTHER ORDERED** that, except by leave of this Court, during pendency of the Receivership ordered herein, the Additional Individual Defendants, their Representatives, corporations, subsidiaries, divisions, or affiliates, and all investors, creditors, stockholders, lessors, customers and other persons seeking to establish or enforce any claim, right, or interest against or on behalf of the Additional Individual Defendants, and all others acting for or on behalf of such persons, are hereby enjoined from taking action that would interfere with the exclusive jurisdiction of this Court over the assets or documents of the Receivership Defendants, including, but not limited to:

A.  Commencing, prosecuting, or continuing a judicial, administrative, or other action or proceeding against the Receivership Defendants, including the issuance or employment of process against the Receivership Defendants, except that such actions may be commenced if necessary to toll any applicable statute of limitations;

B.  Filing or enforcing any lien on any asset of the Receivership Defendants, taking or attempting to take possession, custody, or control of any asset of the Receivership Defendants; or attempting to foreclose, forfeit, alter, or terminate any interest in any asset of the Receivership Defendants, whether such acts are part of a judicial proceeding, are acts of self-help, or otherwise;

C.  Initiating any other process or proceeding that would interfere with the Receiver managing or taking custody, control, or possession of, the assets or documents subject to this receivership.

*Provided that*, this Order does not stay:  (i) the commencement or continuation of a criminal action or proceeding; (ii) the commencement or continuation of an action or proceeding by a governmental unit to enforce such governmental unit's police or regulatory power; or (iii) the enforcement of a judgment, other than a money judgment, obtained in an action or

proceeding by a governmental unit to enforce such governmental unit's police or regulatory power.

## XVI.

### DISTRIBUTION OF ORDER BY DEFENDANTS

**IT IS FURTHER ORDERED** that Additional Individual Defendants shall immediately provide a copy of this Order to each affiliate, sales entity, successor, assign, member, officer, director, employee, agent, independent contractor, client company, servant, attorney, spouse, subsidiary, division, and representative of any Additional Individual Defendant, and shall, within ten (10) days from the date of entry of this Order, provide the FTC with a sworn statement that Additional Individual Defendants have complied with this provision of the Order, which statement shall include the names and addresses of each such person or entity who received a copy of this Order.  Furthermore, Additional Individual Defendants shall not take any action that would encourage officers, agents, members, directors, employees, salespersons, independent contractors, attorneys, subsidiaries, affiliates, successors, assigns or other persons or entities in active concert or participation with them to disregard this Order or believe that they are not bound by its provisions.

## XVII.

### SERVICE ON FINANCIAL INSTITUTIONS,
### ENTITIES OR PERSONS

**IT IS FURTHER ORDERED** that copies of this Order may be served by any means, including facsimile transmission, email, and overnight delivery service, upon any financial institution or other entity or person that may have possession, custody, or control of any documents or assets of any Additional Individual Defendant, or that may otherwise be subject to any provision of this Order.  Service upon any branch or office of any financial institution shall effect service upon the entire financial institution.

## XVIII.

## GENERAL SERVICE OF ORDER

IT IS FURTHER ORDERED that pursuant to Fed. R. Civ. P. 4(c)(2), this Order and the papers filed in this matter may be served on the Additional Individual Defendants, upon the business premises of Additional Individual Defendants, and upon any financial institution or other entity or person that may have possession, custody or control of any documents or assets of any Additional Individual Defendant, or that may be subject to any provision of this Order, by employees of the FTC, by employees of any other law enforcement agency, by any agent of Plaintiff or by any agent of any process service retained by Plaintiff.

## XXIX.

## CORRESPONDENCE

**IT IS FURTHER ORDERED** that, for the purpose of this Order, all correspondence and service of pleadings on Plaintiff shall be addressed to:

Roberto Anguizola and Tracey Thomas
Federal Trade Commission
600 Pennsylvania Avenue NW, #286
Washington, DC 20580
FAX: 202-326-3395
Email: ranguizola@ftc.gov, tthomas@ftc.gov

## XX.

## DURATION OF THE PRELIMINARY INJUNCTION

**IT IS FURTHER ORDERED** that this Order shall remain in full force and effect pending trial on the merits unless sooner modified or dissolved.

///

///

///

///

## XXI.

## RETENTION OF JURISDICTION

**IT IS FURTHER ORDERED** that this Court shall retain jurisdiction of this matter for all purposes.

**IT IS SO ORDERED.**

DATED: June 17, 2010

_____
PHILIP M. PRO
United States District Judge