1

2

3                    UNITED STATES DISTRICT COURT

4                        DISTRICT OF NEVADA

5                               * * *

6  FEDERAL TRADE COMMISSION,        )
                                    )
7              Plaintiff,           )        2:09-CV-01349-PMP-RJJ
                                    )
8  v.                               )
                                    )        ORDER
9  GRANT CONNECT, LLC, et al.,      )
                                    )
10             Defendants.          )
                                    )

11         Presently before the Court are the following motions:

12         • Motion for Summary Judgment and/or to Dismiss by Defendant Kyle Kimoto

13  (Doc. #155)

14         • Motion for Summary Judgment by Defendant Global Fulfillment, Inc. (Doc.

15  #266)

16         • Motion for Summary Judgment by Defendant Dragon Group, Inc. (Doc. #267)

17         • Motion for Summary Judgment by Defendant MSC Online, Inc. (Doc. #268)

18         • Motion for Summary Judgment by Defendant Global Gold Limited (Doc. #269)

19         • Motion for Summary Judgment by Defendants Acai, Inc.; Healthy Allure, Inc.;

20  and Total Health, Inc. (Doc. #270)

21         • Motion for Summary Judgment by Defendants Allclear Communications, Inc.;

22  Elite Benefits Group, Inc.; Global Gold, Inc.; Steven R. Henriksen; Premier Plus

23  Member, Inc.; and Vcomm, Inc. (Doc. #272)

24         • Motion for Summary Judgment by Defendant Paid to Process, Inc. (Doc. #273)

25         • Motion for Summary Judgment by Plaintiff Federal Trade Commission (Doc.

26  #275)

• Motion Under Rule 201 by Defendant Kyle Kimoto (Doc. #314).

The Court held a hearing on these motions on April 11, 2011.  (Mins. of Proceedings (Doc. #323).)

**I. BACKGROUND**

Defendant Horizon Holdings, LLC is a limited liability company located in Reno, NV, doing business as Grant Connect and MemberLegalNet.  (Pl.'s Mot. for Prelim. Inj. (Doc. #6) ["Pl.'s Mot."], Exs. 66-67, 70-71, 81-82.)  Horizon Holdings, LLC's members are Defendants James Gray ("Gray") and Randy O'Connell ("O'Connell").  (Id., Exs. 66-67.)  Defendant Global Gold, Inc. ("Global Gold") is a Nevada corporation located in Las Vegas, Nevada, which is owned by Defendant Steven Henriksen ("S. Henriksen").  (Id., Exs. 110, 112-113.)  Defendant Vantex Group, LLC ("Vantex") is a limited liability company located in Las Vegas, Nevada.  (Id., Ex. 117.)  Vantex's sole member is the Juliette Kimoto Asset Protection Trust, for which Defendant Juliette Kimoto is the investment trustee.  (Opp'n to FTC's Mot. for Prelim. Inj. (Doc. #62) ["J. Kimoto Opp'n"], Ex. A.)  Defendant Vertek Group, LLC ("Vertek") is a limited liability company located in Las Vegas, Nevada.  (Pl.'s Mot., Ex. 119.)  Vertek's sole member is Defendant Pink LP.  (J. Kimoto Opp'n, Ex. A.)  Pink's general partner is Juliette Kimoto.  (Id.; Pl.'s Mot., Ex. 328.)  Defendant Rachael Cook ("Cook"), Defendant S. Henriksen's sister, manages both Vertek and Vantex.  (Pl.'s Mot., Exs. 329-30, 366, 430; Report of Receiver's Activities (Doc. #64) ["Receiver's Report"].)  Michael Henriksen ("M. Henriksen"), Defendant S. Henriksen's brother, was the accountant for Vertek and Vantex.  (Pl.'s Mot., Exs. 189, 430; Receiver's Report.)

In late 2006 or early 2007, Defendant Kyle Kimoto ("Kimoto") contacted O'Connell and Gray on behalf of Global Gold to express Global Gold's interest in creating an online store through which members could purchase merchandise by applying a portion of the price to a credit line.  (Pl.'s Mot., Exs. 565-66.)  Global Gold needed software to accept transactions over the Internet.  (Id.)  O'Connell and Gray agreed to provide services

to Global Gold through use of their program, AWARE.  (Id.)

In June 2007, Gray and O'Connell's company, OS Marketing, LLC, entered into a contract with Global Gold to provide the requested services.  (Id.)  OS Marketing, LLC had no employees, and thus Gray and O'Connell provided the services through Defendant O'Connell Gray, LLC, of which Gray and O'Connell are both members.  (Id.)  In mid 2007 or early 2008, O'Connell and Gray attended a meeting at the Global Gold offices regarding the project.  (Id.)  The meeting took place at the Vertek offices in Las Vegas, Nevada.  (Id.)  At the time, Global Gold and Vertek shared an office suite at this location, although Global Gold later moved to a nearby location.  (Id., Ex. 565.)

Some time thereafter, Kimoto introduced O'Connell and Gray to a "grant opportunity."  (Id., Exs. 565-66.)  Kimoto, O'Connell, and Gray "agreed to work together on a project, which became known as Grant Connect, to advertise grants."  (Id., Ex. 566.)  Under the parties' arrangement, O'Connell and Gray were to find and secure content for a website and arrange for intake and processing of customer information.  (Id., Exs. 565-66.)  Vertek was to create and design marketing, and to secure affiliate marketing relationships.  (Id.)  Global Gold was to sell Grant Connect as an "upsell" on Global Gold's own offers of credit lines.  (Id.)  The parties agreed to split profits, with Vertek receiving 55%, and Grant Connect receiving 45%.  (Id.)  Additionally, Global Gold received 50% of revenue generated from the sale of Grant Connect through upsales off of Global Gold's sites.  (Id.)

O'Connell and Gray purchased the Grant Connect content from Quantum Particle and Khaled Azar based on content already on the Internet at a website called www.grantsearchlink.com.  (Id., Exs. 566, 568-69.)  The website material included testimonials from individuals claiming they received hundreds of thousands of dollars in government grant funds quickly and easily through the website.  (Id., Exs. 1, 2, 11, 16, 30-32, 566, 570.)  The testimonials "were from individuals Khaled Azar claimed to have helped to get grants through the use of www.grantsearchlink.com.  None of the individuals

1   used in the testimonials used www.grantconnect.com to secure a grant." (Id., Ex. 566; see

2   also id. Ex. 570.)  Even though none of the individuals giving testimonials ever used the

3   websites related to Grant Connect, Vertek used the testimonials in designing the inaugural

4   Grant Connect website, www.grantconnectoffer.com, and Vertek and/or Vantex[1] used the

5   testimonials in later iterations of the same content at other web addresses, including

6   grantsourceamericaoffer.com, and grantsourceamerica.com.  (Id., Exs. 1, 2, 5, 11, 30-32,

7   443, 447, 565-66.)

8          The Grant Connect websites' landing pages typically used pictures of President

9   Barack Obama and Vice President Joe Biden or pictures of a woman holding cash.  (Id.,

10   Exs. 1, 2; Compl. (Doc. #1), Ex. 2.)  The websites touted the availability of billions of

11   dollars in government grants, and included quotes from news sources such as Fox, NBC,

12   and CBS.  (Pl.'s Mot., Exs. 1, 2, 16.)  The websites advertised an easy-to-use program to

13   "[i]nstantly find the Grant that's right for you!" (Id., Ex. 1.)  The websites suggested

14   individual consumers could obtain grants for their personal financial needs by stating things

15   such as: "Grants are FREE MONEY given by foundations or the government to help you

16   with your financial situation."  (Id., Exs. 1, 2.)  The website indicated the consumer could

17   get money for:

18   ///

19

20          [1] Vertek and Vantex operated out of the same office, with the same employees who used both
21   Vantex and Vertek email addresses.  (Pl.'s Mot., Exs. 401, 430, 529-32, 535.)  Vertek initially
     performed the internet marketing services at issue in this case.  (Id., Exs. 565-66, 569.)  According to
22   Juliette Kimoto, she created Vantex in March 2008 "for the purpose of conducting all Internet
     marketing activities.  After Vantex's formation, all of Vertek's customers, employees, and business
23   operations relating to Internet marketing activities were transferred to Vantex." (J. Kimoto Opp'n, Ex.
     A.) Since then, Vertek ceased engaging in the internet marketing business, and primarily engages only
24   in real estate investment.  (Id.)  O'Connell states that some time in April 2008, he asked M. Henriksen
     why Vertek was changing its name to Vantex, and M. Henriksen replied that Vertek "was for real estate
25   and should not have been used for the online business."  (Pl.'s Mot., Ex. 565.)  Vantex and Vertek
     continued to have identical websites as of at least April 13, 2009.  (Id., Ex. 12.)
26

✓ Home Purchase          ✓ Small Businesses
✓ Child Care             ✓ Medical Expenses
✓ Debt Consolidation     ✓ Personal Grants

(Id., Ex. 11.)  The landing pages also had testimonials from individuals who never actually used the websites.  (Id., Exs. 1, 2, 11, 16.)

On the websites' landing page, the consumer was directed to enter information including their name, address, email address, and phone number.  (Id.)  The consumer had to click on a box to indicate the consumer had read and agreed with the privacy policy.  (Id., Exs. 1, 2.)  The consumer then would click on the "Get Access Now!" or "Find My Money!" button.  (Id., Exs. 1, 16.)

Clicking on the button took consumers to the second page of the website, which contained the same information as the first page, but added data fields for the consumer to enter their credit or debit card information.  (Id., Exs. 5, 17.)  The websites required the consumer to click in a box to indicate the consumer had read and agreed to "the Terms and Conditions, Privacy Policy and Offer Details below."  (Id.)  The terms and conditions and privacy policy were underlined to indicate a link the consumer would have to click on to read the terms and conditions and privacy policy.  (Id.)  Beneath the checkbox was the button "Get Access Now!" or "Find My Money!"  (Id.)

Beneath that button, in smaller, more compact type, were the "offer details." (Id.)  The offer details stated that by clicking the "submit" button, the consumer agreed that Grant Connect would charge the credit or debit card a certain amount, usually $2.78, as a processing fee for the consumer's seven day trial membership.  (Id.)  Following the trial period, the consumer's credit or debit card would be charged $39.95 per month.  (Id.)

Additionally, the offer details included "upsells" through negative options, meaning the consumer would be charged for additional products or services if they agreed to purchase Grant Connect and did not cancel the upsell offers within the trial membership period.  (Id., Ex. 5.)  The upsells consisted of offers for other programs, usually owned by

5

O'Connell and Gray (such as MemberLegalNet, described as a legal support program) or

offers by S. Henriksen and Global Gold (such as ID Pro Alert, described as an identity theft

protection program; SmartHealth Gold, described as a medical discount program; and

VComm, described as a long distance calling service).  (Id., Exs. 5, 17, 42.)  The upsell

offers contained text similar to the following:

> As an additional bonus, you will also receive a 14 day trial of
> SmartHealth Gold medical and lifestyle benefits for a processing fee of
> $1.95.  Unless you cancel, SmartHealth Gold will bill your account
> $19.95 for the services each month thereafter.  You have the right to
> cancel by calling the number listed at smarthealthgold.com.

> As an additional bonus, I agree to receive a 14 day trial to
> MemberLegalNet.  After the trial period, unless I cancel,
> MemberLegalNet will charge my account $12.95 a month thereafter.  I
> may cancel by calling the toll free number located at
> memberlegalnet.com.

(Id., Ex. 5.)

By clicking on the appropriate link, consumers were taken to the site's terms and

conditions page.  The terms and conditions state the consumer has agreed to a seven day

free trial, which the consumer could cancel at any time by calling the Grant Connect

customer service center at the provided number.  (Id., Ex. 4.)  If the consumer did not

cancel within the seven day trial period, Grant Connect would charge a monthly

membership fee, usually $30 plus a $9.95 monthly maintenance fee, which would be billed

automatically each month to the consumer's credit card or checking account, unless the

consumer canceled the agreement thirty days in advance.  (Id.)  The monthly maintenance

fee was non-refundable.  (Id.)  The Grant Connect terms and conditions page also listed

terms and conditions for the various upsell offers, although it did not always include the

price of those programs, particularly for SmartHealth Gold.  (Id., Exs. 4, 21.)

Upon purchasing Grant Connect, the consumer was directed to navigate to the

Grant Connect website, www.grantconnect.com.  (Id., Ex. 22.)  There, the consumer would

enter a provided password to access the Grant Connect database, where they could search

for grants.  (Id.)

        Global Gold provided telephone and internet chat customer service for the Grant Connect products.  (Id., Exs. 29, 41, 521.)  During the online chats, Global Gold representatives indicated, in response to consumer inquiries, that consumers could use the Grant Connect website to locate grants for things such as expansion of an auto salvage business, college, buying a home, home renovation, personal financial needs, hospitalization costs, utilities bills for a personal residence, rent assistance, paying off past personal debts, medical bills, and obtaining a personal loan.  (Id., Exs. 298, 522, 525-26.) Global Gold customer service representatives further represented that a consumer could use the Grant Connect database to find a grant to pay off a home mortgage, and that 85-90% of their customers qualified for such grants.  (Id., Ex. 298.)  Horizon Holdings initially paid for the Grant Connect customer service number, but as of February 6, 2009, Global Gold paid the telephone bill for this number.  (Id., Exs. 4, 63-64.)

        Although advertised as a quick and easy means to obtain individual grants for personal financial needs, the website was neither quick and easy, nor a source to find grants for personal financial needs.  According to David G. Bauer ("Bauer"), who has worked in grant seeking and related consulting since 1977, the www.grantconnectoffer.com website was misleading because it referred to assisting individuals' financial situation, yet most grants in the Grant Connect database related to grants aimed at achieving a public purpose. (Id., Ex. 298.)  Additionally, Bauer concluded the database was not easy to use, misled consumers to believe they were likely to obtain a grant, and contained outdated data.  (Id.)

        Grant Connect was advertised on its own websites and also offered for a period of time on Global Gold's various websites as an upsell to Global Gold's credit line offers. (Id., Ex. 331.)  Global Gold's offers included www.firstplusplatinumoffer.com ("First Plus Platinum") and www.firstuniversalplatinumoffer.com ("First Universal Platinum").  (Id., Exs. 6, 44.)  For the credit line offers, the initial ad would consist of a banner or email

which would state things like "$7,500 unsecured credit line," and

No credit checks!
No Employment verifications!
No Security Deposits!
Bankruptcy?  No problem!
APPROVAL GUARANTEED!

(See, e.g., Exs. Vol. 18 (Doc. #234-3) at 6, 7, 10, 11, & 14.)  The banner ads also stated the consumer would receive "0% interest for 12 months and 7.9% thereafter."  (Id.)  There was no mention that this was not a traditional line of credit or that the credit line could be used only at the merchant's online store.  Clicking on the "activate now," "get credit now," or similar buttons on the banner ad would take the consumer to a line of credit ("LOC") landing page.

The First Plus Platinum website's landing page featured in large font "$7,500 credit line." (Pl.'s Mot., Ex. 6.)  The landing page offered 0% interest for the first twelve months, and guaranteed approval.  (Id.)  The page also contained quotes from various news sources about the necessity for credit, and a quote from Forbes stating, "The easiest way to improve your credit." (Id.)  The landing page provided data fields for the consumer to enter a name and address, and a box to click to indicate the consumer had read the privacy policy. (Id.)  Additionally, sometimes the LOC landing pages showed an image of what appeared to be a traditional credit card.  (Id., Ex. 44, Exs. Vol. 21 (Doc. #238-2).)

By filling out the above information and clicking on the "submit" button, the consumer was taken to a second page in the website.  There, consumers were told they are one step away from their $7,500 credit line, and if they activate today, they will receive a bonus $1,500 unsecured cash advance.  (Pl.'s Mot., Ex. 42.)  The second page indicated the consumer would receive a $7,500 credit line, the application fee was waived, but there was a $2.78 rush activation fee.  (Id.)  Below this information were data fields for the consumer to enter their credit or debit card information.  (Id.)  Similar to the Grant Connect site, the page contained a box in which the consumer must click to indicate the consumer read the

terms and conditions, the privacy policy, and the offer details below.  (Id.)  The terms and conditions and privacy policy were underlined, indicating a link which the consumer could click on to read the related web pages, beneath which is the submit button.  (Id.)  Beneath the submit button were some icons regarding internet security, and below those icons were the offer details.  (Id.)

Like the Grant Connect site, the First Plus Platinum site offered various upsells with negative options resulting in the consumer incurring monthly charges for each offer if the consumer did not cancel within the trial period.  (Id.)  The offer details also stated that the line of credit "is for use towards thousands of our merchandise items only."  (Id.)  The terms and conditions web page stated that the First Plus Platinum was not a credit card. (Id., Ex. 7.)  Rather, as set forth in paragraph 3 of the terms and conditions, entitled "Disclaimers," the First Plus Platinum "is a line of credit that can be used by an Account holder to purchase merchandise exclusively at the First Plus Platinum Web site."  (Id.) Paragraph 23 of the terms and conditions stated that the consumer accepts "enrollment for up to 2 additional promotional product offers using the relevant data" entered for the First Plus Platinum card.  (Id.)  The terms and conditions contained links to the various offers' websites for further details.  (Id.)  If the consumer attempted to navigate away from the website, a chat box would appear offering the consumer a "$7,500 line of credit with 0% interest rate for one-year and a 99¢ activation fee."  (Id., Ex. 43.)

Global Gold made a similar offer through www.firstuniversalplatinumoffer.com. (Id., Ex. 44.)  The First Universal Platinum landing page offered in large type a "guaranteed $7,500 unsecured line of credit."  (Id.)  Below that language, and in smaller type, it stated "towards thousands of our merchandise items."[2]  (Id.)  As with the other websites, the initial page provided fields for the consumer to enter a name and address and to indicate the

---

[2] The LOC offers did not always mention they were not a general line of credit on the landing page.  (Pl.'s Mot., Ex. 6, Exs. Vol 21 (Doc. #238-2) at 21.)

consumer had read and agreed with the privacy policy.  (Id.)  Similar to the First Plus Platinum website, the second page indicated a $7,500 credit line, a waived application fee, and a rush activation fee of $2.78, beneath which the consumer would enter credit or debit card information.  (Id., Ex. 45.)  The second page also included the checkbox to indicate the consumer had read the terms and conditions, privacy policy, and offer details; and the offer details for the negative option upsell offers in smaller, more compact text beneath the submit button.  (Id.)  Occasionally, the credit line offers placed a countdown timer on the second page, indicating the consumer would receive an increased credit line if they submitted their credit or debit card information within a certain period of time.  (Id., Exs. 391, 395.)  At no point was the consumer permitted to view the online store prior to submitting payment information.  (Exs. Vol. 37 (Doc. #254) at 70.)

The First Universal Platinum member agreement indicated the First Universal Platinum cards were "not major credit cards such as Visa or Mastercard, or American Express."  (Pl.'s Mot., Ex. 46.)  The First Universal Platinum membership fee was a recurring monthly charge of $39.95, which would apply to the current outstanding card balance.  (Id.)  In paragraph 3 of the membership terms, entitled "Disclaimers," the terms indicated the line of credit "can be used by an Account holder to purchase merchandise exclusively at the FIRST UNIVERSAL PLATINUM website."  (Id.)  Paragraph 22 contained similar language as the First Plus Platinum terms that the consumer agreed to enrollment in up to two additional promotional offers, with links to the affiliated promotional offers' websites.  (Id.)  The terms and conditions sometimes did not tell the consumer what the upsells cost, and/or referred them to the upsell offer's website to get information on the upsells.  (Pl.'s Mot., Exs. 4, 7; S. Henriksen's Opp'n to Mot. Prelim. Inj., Ex. E.)

As of April 13, 2009, Vantex and Vertek maintained their own company websites which were essentially identical, and both included reference to grant offers.  (Pl.'s Mot.,

Ex. 12.)  The Vantex and Vertek websites were registered in a single account which listed

Juliette Kimoto as the contact person, but provided the contact email address

steve50678@aol.com.  (<u>Id.</u>, Exs. 53-55.)  S. Henriksen used the email address

steve50678@aol.com as the contact email address on business account applications for

Global Gold.  (<u>Id.</u>, Exs. 178, 180, 181.)  Vantex also registered the websites

www.grantconnectoffer.com, www.grantsourceamerica.com,

www.firstplusplatinumoffer.com, and firstuniversalplatinumoffer.com.  (<u>Id.</u>, Exs. 56, 59-

61.)  O'Connell Gray, LLC registered the websites www.grantconnect.com and

memberlegalnet.com.  (<u>Id.</u>, Ex. 57-58.)

Grant Connect and Global Gold accumulated numerous customer complaints in

the form of complaints to the Better Business Bureau, customer service calls, customer

service live chats, letters, emails, and customers having their credit cards charge back the

fees to Grant Connect and Global Gold.  (<u>Id.</u>, Exs. 374-75; Receiver's Report.)  Typical of

the consumers' complaints were that they had been charged for services they had never

agreed to, most often related to the negative option upsell offers.  (<u>Id.</u>, Exs. 374-75.)

Customers also complained that they were unable to find any grants using Grant Connect,

and that they thought they were receiving a credit card through Global Gold's various credit

line offers.  (<u>Id.</u>, Exs. 374-76.)  When consumers called to cancel the various offers, Global

Gold customer service representatives required the consumers to call different numbers for

each upsell program, even though calls for all the programs were answered out of the same

call center.  (Receiver's Report.)

As of July 29, 2009, Grant Connect had total sales of $4.3 million from August

2008 to June 2009, but consumers charged back and/or received refunds totaling 20% of

sales.  (<u>Id.</u>)  Of the over 52,000 grant memberships sold, 91% canceled by August 2, 2009.

(Pl.'s Mot., Ex. 527.)

///

Global Gold and the other Henriksen entities had total sales of $29.1 million from January 2008 to June 2009.  (Receiver's Report.)  These entities had a chargeback and refund rate of 15% of total sales, and up to a 23% chargeback rate by June 2009.  (Id.) Additionally, Global Gold entities were fined over $380,000 by the credit card networks, indicating chargeback rates substantially above the amount credit card companies approved. (Id.)  Moreover, of the over 500,000 line of credit customers enrolled, 94% had canceled by August 2, 2009.  (Pl.'s Mot., Ex. 527.)

Accounting and banking records for the Defendant entities show a variety of transfers amongst Defendants and include various undocumented loans and accounts receivable amongst Defendants.  (Id., Exs. 86-88, 134-58, 210-211; Receiver's Report.) Global Gold's profit and loss statements and 1099 summaries were located in the Vantex offices.  (Pl.'s Mot., Exs. 453-54.)  Additionally, Global Gold's computerized accounting records were located on Vantex's computers.  (Id., Ex. 528.)

FTC brought this action on July 27, 2009, alleging Defendants Grant Connect; Global Gold; Horizon Holdings; O'Connell Gray, LLC,; Pink LP; Vantex; Vertek; Cook; Gray; S. Henriksen; Juliette Kimoto; and O'Connell deceptively marketed Grant Connect and the credit line offers, failed to adequately disclose the upsells and the related monthly charges, and debited consumers' bank accounts on a recurring basis without obtaining written authorization.  FTC alleges Defendants engaged in a common enterprise while participating in these acts, and thus are jointly and severally liable.  FTC sought injunctive relief against these Defendants, which this Court granted on September 22, 2009.  (Prelim. Inj. (Doc. #83).)  The Court also appointed a Receiver over the corporate entity Defendants. (Id.)

In April 2010, FTC amended the Complaint to add factual allegations regarding other allegedly fraudulent internet website offers, including offers related to work from home and the acai berry.  The Amended Complaint (Doc. #112) added four new individual

Defendants:  M. Henriksen, Tasha Jn Paul, Kimoto, and Johnnie Smith.  The Amended

Complaint also added fifteen new corporate Defendants:  Acai, Inc.; AllClear

Communications, Inc.; Consolidated Merchant Solutions, LLC; Dragon Group, Inc.; Elite

Benefits, Inc.; Global Fulfillment Inc.; Global Gold Limited; Healthy Allure, Inc.; Juliette

M. Kimoto Asset Protection Trust; MSC Online, Inc.; OS Marketing Group, LLC; Paid to

Process, Inc.; Premier Plus Member, Inc.; Total Health, Inc.; and Vcomm, Inc.  The Court

granted a second Preliminary Injunction (Doc. #165) against these Defendants in June 2010.

  The parties now cross-move for summary judgment.  Since the filing of the

summary judgment briefing, FTC has entered into consent judgments with Defendants

Johnnie Smith (Doc. #330) and Vantex Group, LLC; Vertek Group, LLC; Pink LP; Juliette

Kimoto Asset Protection Trust; and Juliette Kimoto (Doc. #338).  This Order therefore has

no application to these Defendants.

## II.  LEGAL STANDARD

  Summary judgment is appropriate if the pleadings, the discovery and disclosure

materials on file, and any affidavits show that "there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a), (c).  A fact is "material" if it might affect the outcome of a suit, as determined by the

governing substantive law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  An

issue is "genuine" if sufficient evidence exists such that a reasonable fact finder could find

for the non-moving party.  Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1061 (9th

Cir. 2002).  Initially, the moving party bears the burden of proving there is no genuine issue

of material fact.  Leisek v. Brightwood Corp., 278 F.3d 895, 898 (9th Cir. 2002).  After the

moving party meets its burden, the burden shifts to the non-moving party to produce

evidence that a genuine issue of material fact remains for trial.  Id.  The Court views all

evidence in the light most favorable to the non-moving party.  Id.

///

**III.  KYLE KIMOTO'S MOTION FOR SUMMARY JUDGMENT (Doc. #155);
KYLE KIMOTO'S MOTION UNDER RULE 201 (Doc. #314)**

Kimoto moves for summary judgment, arguing FTC cannot show he participated in any violations, and even if he did, he obtained advice from a lawyer and he therefore lacks the requisite scienter.  FTC responds by pointing to the declarations of Defendants O'Connell and Gray, who both identified Kimoto as the mastermind behind the Grant Connect offering.  FTC also points to its evidence, as set forth in the Preliminary Injunction (Doc. #83) and the Second Preliminary Injunction (Doc. #165), upon which this Court found FTC was likely to prevail on the merits that Grant Connect was deceptive and that it was likely to prevail in showing Kimoto participated in and/or controlled the acts of Vertek and Vantex employees.

Kimoto has presented no evidence or argument why the evidence supporting the Second Preliminary Injunction does not raise issues of fact regarding his liability.  The Court therefore will deny Kimoto's motion.

The Court also will deny Kimoto's Motion Under Rule 201 (Doc. #314).  Kimoto requests the Court take judicial notice that a scienter requirement is necessary for FTC to prevail and that an interpretation that intent is not necessary raises constitutional concerns. The scienter that is required is as set forth in the Preliminary Injunction: (1) participation directly in the acts or practices or authority to control the acts; and (2) actual knowledge of material misrepresentations, reckless indifference to the truth or falsity of a misrepresentation, or awareness of a high probability of fraud along with an intentional avoidance of the truth.  F.T.C. v. Cyberspace.Com LLC, 453 F.3d 1196, 1202 (9th Cir. 2006).  To the extent Kimoto is suggesting some other proof of intent is required, his motion is denied.

///

///

14

**IV.  S. HENRIKSEN AND HIS ENTITIES' MOTIONS FOR SUMMARY JUDGMENT (Doc. #266 (GLOBAL FULFILLMENT), #267 (DRAGON), #268 (MSC), #269 (GLOBAL GOLD LIMITED), #270 (ACAI, INC.; TOTAL HEALTH; HEALTHY ALLURE), #273 (PAID TO PROCESS), & #272 (GLOBAL GOLD, INC.; ELITE BENEFITS, INC.; PREMIER MEMBER PLUS, INC.; VCOMM, INC.; ALLCLEAR COMMUNICATIONS, INC.; & S. HENRIKSEN))**

S. Henriksen and his various entities ("Moving Defendants") move for summary judgment in several separately-filed motions.  Generally, Moving Defendants argue FTC did not make particularized allegations against most of the Moving Defendants in the Amended Complaint, and FTC cannot lump all Defendants in all allegations.  Moving Defendants also contend they did not engage in any of the alleged misconduct, and they were not part of a common enterprise with the other Defendants.  Moving Defendants argue they were separately owned and operated; had their own mailing addresses, phone and fax numbers, toll free customer service phone numbers, bank accounts, merchant accounts, and email and web servicers; entered into their own contracts; and paid their own bills.  Moving Defendants contend these facts demonstrate they were not a common enterprise.  Moving Defendants also argue the LOC, work-from-home, and acai offers were not deceptive.

FTC responds that it set forth allegations against each Defendant, and to the extent it made allegations referring to all Defendants, it meant all Defendants engaged in the alleged conduct.  FTC also argues that most of the Moving Defendants do not present any evidence that any of the schemes did not violate the FTC Act and Moving Defendants directly participated in and/or benefitted from the schemes.  FTC contends its own motion for summary judgment raises sufficient questions of fact to preclude summary judgment for any Defendant on any claim.  FTC further notes that Moving Defendants do not move for summary judgment on the grant offer, and therefore at best they are seeking partial summary judgment on the LOC offers.  FTC also argues Moving Defendants were part of a common enterprise, and thus are jointly and severally liable on all counts.

///

1    With respect to the argument that FTC did not make particularized allegations as

2 to each Defendant in the Amended Complaint, that type of challenge is appropriate at the

3 dismissal stage.  This case is at the summary judgment stage, and FTC set forth what it

4 contends each Defendant did and supported those contentions with literally hundreds of

5 exhibits.  Defendants may not agree with FTC's characterization of their activities, but there

6 is no confusion about the behavior FTC accuses each Defendant of having engaged in at

7 this point in the proceedings.

8    As to Moving Defendants being separate entities and not part of a common

9 enterprise, Defendants make various representations about their corporate separateness in

10 their motions.  However, Defendants do not support most of these statements with

11 admissible evidence, and in some instances the evidence Defendants rely upon raises issues

12 of fact regarding common enterprise.  For example, Defendant Global Fulfillment, Inc.

13 ("Global Fulfillment") was founded by S. Henriksen as a fulfillment company to provide

14 the products customers purchased through the LOC offers.  S. Henriksen testified at his

15 deposition that he is the sole owner, president, and director of Global Fulfillment.  He also

16 testified that Global Fulfillment shared a physical address with Global Gold and "[i]t was

17 basically just Global Gold's fulfillment company.  Really the same company, as well."

18 (Mot. Summ. J. (Doc. #266), Ex. 1 at 52-53.)  S. Henriksen also testified Global Fulfillment

19 did not have its own employees, it shared Global Gold's employees.  (Id. at 53.)

20    The same is true of all of the corporate Moving Defendants.  They are all owned

21 by S. Henriksen, and operated out of the same physical address using the same employees.

22 Although Moving Defendants represent in their papers, without citation to record evidence,

23 that they had separate mailing addresses, these Defendants shared a physical address with S.

24 Henriksen's entity, Global Gold.  Even if Defendants had their own phone numbers, bank

25 accounts, and paid their own bills, that would not preclude a common enterprise finding.

26 As discussed more fully below with respect to FTC's Motion for Summary Judgment,

common enterprise is not the same thing as the corporate alter ego doctrine.

Moreover, the arguments and evidence presented in support of FTC's Motion for Summary Judgment raise genuine issues of material fact as to each scheme's deceptive nature, each Defendant's participation in the various schemes, and all Defendants' participation in a common enterprise. Although Moving Defendants attempt to defend the LOC, work-from-home, and acai offers, their defense is a rehashing of the same arguments made at the preliminary injunction stage. Based on the same evidence and argument, this Court found FTC was likely to prevail on the merits, and the Court entered the Preliminary Injunction. Issues of fact therefore remain and the Court will deny Moving Defendants' Motions for Summary Judgment.

## V.  PLAINTIFF FTC'S MOTION FOR SUMMARY JUDGMENT (Doc. #275)

Plaintiff FTC moves for summary judgment against all remaining Defendants on all of the various offers. Specifically, FTC contends the Grant Connect, LOC, work-from-home, and Acai Total Burn offers were deceptive, failed to disclose material terms, and used phony testimonials. FTC also argues Defendants engaged in the unauthorized debiting of consumers' bank accounts. FTC thus contends it is entitled to summary judgment on all of its claims that Defendants violated Section 5(a) of the FTC Act in relation to each of the offers and that Defendants violated the Electronic Funds Transfer Act ("EFTA") and Regulation E. FTC further contends the corporate Defendants are jointly and severally liable because they were a common enterprise, and the individual defendants are personally liable because they had authority to control the corporate Defendants and/or they had actual knowledge of or were recklessly indifferent to the deception. FTC therefore seeks injunctive and equitable monetary relief.

Defendants oppose on various grounds, including that the LOC offers disclosed all material terms, the work-at-home offers were not deceptive because they only projected potential income, and the acai offer was not deceptive because Defendants never advertised

celebrity endorsements for the acai offer.  Defendants do not defend the Grant Connect
offer on its merits, although O'Connell and Gray attempt to defend the advertising of Grant
Connect as disclosing all material terms regarding the associated upsells.

A practice is deceptive under the Federal Trade Commission Act "if it is likely to
mislead consumers acting reasonably under the circumstances . . . in a way that is material."
Cyberspace.Com LLC, 453 F.3d at 1199.  "A solicitation may be likely to mislead by virtue
of the net impression it creates even though the solicitation also contains truthful
disclosures."  Id. at 1200.  Making disclosures in fine print may not overcome an
advertisement's deceptive net impression.  Id. at 1200-01 (holding fine print notices on
reverse side of check did not overcome net impression that check was a refund or rebate
when the fine print stated that cashing the check would result in a monthly fee for internet
access); F.T.C. v. Brown & Williamson Tobacco Corp., 778 F.2d 35, 42-43 (D.C. Cir.
1985) (holding advertisement's description of cigarette tar content was deceptive even
though fine print in the corner of the advertisement truthfully explained how the tar content
was measured).  A defendant violates the Act if its advertisement "induces the first contact
through deception, even if the buyer later becomes fully informed before entering the
contract."  Resort Car Rental Sys., Inc. v. F.T.C., 518 F.2d 962, 964 (9th Cir. 1975).

Examples of deceptive conduct violative of the Act include unsubstantiated
claims that consumers can make a lot of money using the defendant's product,
unsubstantiated claims relating to the therapeutic value of the defendant's product, or
providing false testimonials regarding the defendant's product.  See F.T.C. v.
Colgate-Palmolive Co., 380 U.S. 374, 389 (1965) ("It is generally accepted that it is a
deceptive practice to state falsely that a product has received a testimonial from a respected
source."); F.T.C. v. Stefanchik, 559 F.3d 924, 929 (9th Cir. 2009) (finding program that
asserted consumers would make lots of money in a small amount of time by brokering
privately held mortgages was deceptively advertised where it was advertised as the "easiest

way to make $10,000 every 30 days . . . guaranteed," yet the owner had no substantiation for the earnings claim and evidence showed consumers made little to nothing); Sterling Drug, Inc. v. F.T.C., 741 F.2d 1146, 1152 (9th Cir. 1984) (holding that an advertisement claiming scientifically established therapeutic superiority of pain relief medicine had to be substantiated); F.T.C. v. Bronson Partners, LLC, 564 F. Supp. 2d 119, 125 (D. Conn. 2008) ("[W]hen an advertisement contains a testimonial reflecting the experience of an individual with a product, there is an implicit representation that such experience reflects the typical or ordinary results anyone may anticipate from use of the product." (quotation omitted)). While proof that consumers actually were deceived is not required, such evidence is "highly probative to show that a practice is likely to mislead consumers acting reasonably under the circumstances." Cyberspace.Com LLC, 453 F.3d at 1201.

### A.  M. Henriksen's Objections

Defendant M. Henriksen objects to FTC's purported failure to preserve evidence. M. Henriksen argues he is hampered in responding to FTC's motion due to this loss of evidence.  There are three categories of evidence which M. Henriksen claims FTC failed to preserve: (1) emails hosted by rackspace.com; (2) website pages advertising the various offers at Virgin Offers Media; and (3) a computer error resulting in the loss of sales data for Vcomm and Allclear.

As to the failure to preserve the rackspace.com emails, M. Henriksen requested the emails from the Receiver.  The Receiver responded that none of Defendants advised the Receiver about the emails at rackspace.com, and rackspace.com deleted the accounts when no payment was made.  Defendants do not deny that none of them advised the Receiver about the existence of the emails at rackspace.com.  Thus, M. Henriksen's attempt to blame the Receiver for failing to preserve the evidence is disingenuous.

As to the Virgin Offers Media data, that information was lost when Virgin Offers Media suffered a burglary in which it lost equipment and shut down.  Virgin Offers Media

thereafter did not pay for and maintain any electronic data.  FTC is not responsible for this loss of evidence.  Nothing required FTC or the Receiver to preserve evidence at an unrelated, non-receiver entity.

Finally, as to the lost sales data related to Vcomm and Allclear, the Receiver's Report contained data related to these sales.  To the extent M. Henriksen contends the loss of this data renders any damages award speculative, the Court will address that argument below in the discussion regarding damages.

As to all of these objections, Defendants had subpoena power and could have obtained the identified materials.  Moreover, M. Henriksen does not identify what in the lost emails, Virgin Offers Media data, or lost sales data would support his defense.

M. Henriksen has not shown FTC failed to preserve evidence or that if it did, such lost evidence was material to any remaining issue in this case.  The Court therefore will overrule M. Henriksen's objections.

**B.  Common Enterprise**

FTC seeks joint and several liability as to all Defendants as a common enterprise. FTC points to the common ownership, movement of employees, joint work across the various offers without regard to written contracts or corporate formalities, the set up of interdependent economic relationships such that everyone's profits were jointly tied to how many consumers purchased and continued to pay for the various offers and upsells, and the use of the same strategies for all offers.  Defendants contend they were separate entities with separate personnel, addresses, ownership, and they entered into contracts with third parties not alleged to be part of the common enterprise.  Defendants argue that the fact that Defendants did business with each other does not make them a common enterprise.

"[I]n situations where corporations are so entwined that a judgment absolving one of them of liability would provide the other defendants with a clear mechanism for avoiding the terms of the order, courts have been willing to find the existence of a common

enterprise." F.T.C. v. Nat'l Urological Grp., Inc., 645 F. Supp. 2d 1167, 1182 (N.D. Ga. 2008) (quotation omitted).  "When corporations act as a common enterprise, each may be held liable for the deceptive acts and practices of the other."  Id.

"[E]ntities constitute a common enterprise when they exhibit either vertical or horizontal commonality-qualities that may be demonstrated by a showing of strongly interdependent economic interests or the pooling of assets and revenues."  F.T.C. v. Network Servs. Depot, Inc., 617 F.3d 1127, 1142-43 (9th Cir. 2010).  To determine whether a common enterprise exists, the Court considers factors such as:

> common control; the sharing of office space and officers; whether business is transacted through a maze of interrelated companies; the commingling of corporate funds and failure to maintain separation of companies; unified advertising; and evidence that reveals that no real distinction exists between the corporate defendants.

Nat'l Urological Group, Inc., 645 F. Supp. 2d at 1182; see also Delaware Watch Co. v. F.T.C., 332 F.2d 745, 746 (2d Cir. 1964) (finding common enterprise where "the same individuals were transacting an integrated business through a maze of interrelated companies").  The Court evaluates "the pattern and frame-work of the whole enterprise." Nat'l Urological Group, Inc., 645 F. Supp. 2d at 1182 (quotation omitted).

For example, the United States Court of Appeals for the Ninth Circuit found a common enterprise existed where companies were commonly owned; pooled resources, staff, and funds; and participated to some extent in a common venture to sell the same products.  Network Servs. Depot, Inc., 617 F.3d at 1143.  Because the defendants participated in and benefitted from a "shared business scheme," the "common revenue generated in the course of that scheme was the proper subject of the court's equitable powers under the FTC Act."  Id.

No genuine issue of material fact remains that Defendants operated as a common enterprise.  All the various offers were run by the same individuals using different company names.  Defendants changed entity names and swapped and shared personnel.  For example,

Vertek, a Juliette Kimoto entity, changed its name to Vantex in a transition so seamless neither inside employees nor outsiders like O'Connell and Gray noticed a difference.  They both operated out of the same address using the same employees performing the same work.  Vantex's employees were in the process of being rolled into Dragon, an S. Henriksen entity, when FTC obtained the temporary restraining order in this case.  S. Henriksen's entities, although purporting to have different mailing addresses, all operated out of the same physical location using the same employees.  S. Henriksen's entities sometimes shared office space with Vantex, and an office map at Vantex shows office space set aside within the Vantex offices for Dragon employees.  Vantex, in turn, initially operated out of S. Henriksen's home.  S. Henriksen listed M. Henriksen as Global Gold's Director of Accounting on an immigration form in New Zealand, even though M. Henriksen was a Vantex employee.  O'Connell and Gray likewise created different entities, but all operated out of the same physical address using the same employees in Reno.

Defendants also blurred the lines of corporate separateness in their activities.  S. Henriksen's email address was used as the point of contact for Vantex's and Vertek's corporate web addresses, even though he was not an owner or employee of either company, but purportedly was their client.  Vertek and Vantex were the registrars for domains for most of the offers, including the grant, LOC, work-from-home, and nutraceutical offers, even though the content of those websites was owned by S. Henriksen or O'Connell and Gray.  (Pl.'s Mot., Ex. 12 at ¶ 61, Ex. 62 (showing over 100 websites registered by Vantex with variations on the offer names).)  Vantex also advertised the other Defendants' various offers, including Grant Connect, One Hour Wealth Builder, and First Universal Platinum, on Vantex's own website.  (Id., Ex. 13.)

Email traffic shows coordinated activity amongst all Defendants across the spectrum of offer campaigns.  For example, O'Connell and Gray were involved in discussions regarding chargebacks and what credit card statement descriptors ought to be

used for Global Gold's campaigns, even though chargebacks usually would be considered Global Gold's confidential business information.  (Receiver's Report; Exs. Vol. 14 (Doc. #74-1), Exs. 558, 560; Exs. Vol. 28 (Doc. #245), Ex. 803 at 5511-12.)  Gray stated that upon Global Gold's account being canceled due to high chargebacks, O'Connell would "recommend that a new company be created (with different ownership) and we go right back to" the same processor.  (Exs. Vol. 22 (Doc. #239-1), Ex. 768.)  Defendants Johnnie Smith and M. Henriksen, who worked for Vantex/Vertek, not Global Gold, were copied on this email chain.  (Id.)  O'Connell and Gray also were involved in answering questions relating to merchant accounts set up for Paid to Process.  (Receiver's Report.)  M. Henriksen and Kyle Kimoto of Vantex/Vertek met with a potential funder of Global Gold without S. Henriksen, the owner of Global Gold.  (Exs. Vol. 29a & 29b (Doc. #246-1), Ex. 804 at 5783-85.)  O'Connell and Gray and their entities permitted the Las Vegas Defendants to use the AWARE program for new offers without any contractual understanding as to what O'Connell and Gray would be paid in return.  Global Gold's profit and loss statements and 1099 summaries were located in the Vantex offices.  (Exs. Vol. 8 (Doc. #66), Exs. 453-54.)  Additionally, Global Gold computerized accounting records were located on Vantex's computers.  (Exs. Vol. 14 (Doc. #74), Ex. 528.)

Defendants engaged in concerted and coordinated action across campaigns, and made their profits interdependent.  S. Henriksen provided the substantive content for the Acai, Domain Processing/One Hour Wealth Builder (procured by O'Connell and Gray for Global Gold at Kyle Kimoto's urging), and LOC offers, while O'Connell and Gray provided the content for the Grant Connect offer.  Vantex/Vertek provided the creative web design.  O'Connell and Gray provided the AWARE software, and O'Connell and Gray did not require new contracts for the use of AWARE on new offers.  The same two-step ordering process with the inadequately disclosed negative option upsells were used for all offers.  Defendants used Global Gold and/or Dragon to perform customer service for all

offers, yet made customers call separate numbers to cancel each offer and upsell even though all calls were being answered out of the same call center.  Defendants jointly and collectively discussed the chargeback issue across product lines.

Defendants also repeatedly used different company, offer, and credit card descriptor names for the various offers and upsells.  Doing so allowed Defendants to make it appear that Defendants were different companies, and to attempt to lower their chargeback ratios for the various campaigns.  (See Exs. Vol. 14, Ex. 558 at 2640 (discussing plan to avoid chargebacks by "spreading amount [sic] multiple accounts").)

O'Connell and Gray were paid for use of the AWARE software not as a license for each offer, but as a percentage of profits from the various offers.  Defendants thus made their potential profits interdependent on the success of the various offers and upsells.  Accounting and banking records for Defendant entities show a variety of transfers amongst Defendants, and include various undocumented loans and accounts receivable.  (Pl.'s Mot., Exs. 86-88, 134-58, 210-211; Receiver's Report.)

Defendants contend they are separate entities and not a common enterprise because they have separate bank accounts, obey corporate formalities, enter separate contracts, and file separate tax returns.  For example, Defendant OS Marketing provides some contracts it entered into with third parties other than the other Defendants in this case. (O'Connell's & Gray's Opp'n to FTC's Mot. Summ. J. (Doc. #306) at 75-90; Opp'n to Mot. Summ. J. (Doc. #306-1).)  Other than these third party contracts, Defendants provide no evidence of corporate separateness.  Moreover, the common enterprise is not an alter ego analysis.  The entities formally may be separate corporations, but operate as a common enterprise.

As outlined above, no genuine issue of material fact remains that Defendants engaged in a common enterprise for the various offers involved in this case.  The Court therefore will grant FTC's Motion for Summary Judgment on the question of common

enterprise.

**C. Count One**

Count one alleges Defendants made misrepresentations regarding the grant offers.  FTC moves for summary judgment, arguing no genuine issue of material fact remains that Grant Connect was a fraudulent scheme.  Defendants do not attempt to defend the grant offers in and of themselves, instead arguing the upsells on Grant Connect were not deceptively advertised.

As set forth in the Preliminary Injunction, Grant Connect and its other iterations, such as Grant Source America, were deceptively advertised.  Defendants claimed that consumers could obtain grants quickly and easily, and for a variety of personal uses such as home mortgages, personal debts, and medical expenses.  However, grants were not available for individual needs as advertised, finding any grant was neither quick nor easy, and much of the material in the database was outdated, further reducing the likelihood of obtaining a grant.

Moreover, customer service representatives made numerous misrepresentations to consumers who called the customer service line or initiated customer service chats regarding their likelihood to obtain a grant or the availability of grants for personal individual needs, and the overall success rate of Grant Connect customers.  No Defendant attempts to defend Grant Connect on the merits as not deceptively advertised.  O'Connell and Gray attempt to defend on the concept that the upsells were not deceptively advertised, but count one is directed at Grant Connect, not the related upsells.

Defendants M. Henriksen, O'Connell, and Gray argue some of the customer affidavits are false regarding the details of their orders and therefore FTC has failed to support its motion.  Some of Defendants' arguments are merely a disagreement with the customer's statement.  For example, some of the customers aver they never saw anything advising them of the upsells or other charges.  Defendants contend the consumers must

have seen the terms for the upsells because they had to click on the button indicating they read the terms and conditions.  The consumers' statements that they did not see anything about other charges are not demonstrably false.  The fact that they had to click in the box indicating they had read the terms and conditions does not mean they actually read the terms and conditions.  Further, to the extent Defendants identify inaccuracies in some of the consumer affidavits, none of those purported inaccuracies raises an issue of fact regarding the deceptive marketing.  Most of the alleged inaccuracies relate to how much a customer paid or how many times they were billed.  That would not alter the fact that these were in fact consumers who purchased the product and were deceived.  Even if the upsells were fully disclosed, that does not alter the inquiry under count one that Grant Connect, rather than the upsells sold with Grant Connect, was deceptively marketed.  Further, Defendants do not provide evidence documenting every alleged inaccuracy and do not identify inaccuracies in every consumer affidavit.  Thus, even if the Court excluded the affidavits to which Defendants object, other consumer affidavits support FTC's motion.

Defendants point to no evidence raising a genuine issue of material fact that Grant Connect was a legitimate product, that finding a grant was quick and easy as advertised, or that any grant could be obtained for the types of personal needs set forth in the offer or as represented by customer service representatives.  FTC is entitled to summary judgment on count one.

### D.  Count Two - LOC Misrepresentations

Count two alleges Defendants deceptively led consumers to believe they were receiving a general purpose LOC like a traditional credit card.  FTC argues the initial advertisements suggest a traditional line of credit, and the disclosures regarding the fact that it is not a traditional line of credit came later, in smaller print, after the net impression of a credit card already existed in the consumer's mind.  FTC notes that the misleading nature of the offers is bolstered by the high cancellation rate, the high refund and chargeback rate, the

comparatively low number of actual orders from the online store, and the complaints to the Better Business Bureau.

Defendants respond that all material terms were disclosed, as demonstrated by the fact that beneath the words "$7500 credit line" the offer said "towards thousands of our merchandise items." Defendants further argue that consumers could not enter payment information without clicking in a box to indicate they had read the terms and conditions, which disclosed the nature of the offer. Defendants also note the offer details were located on the same page beneath the button the consumer would click to submit their payment information. On the issue of scienter for the individual Defendants, Defendants rely on a letter from Global Gold's attorney stating that the offer was not deceptive and on the fact that Vantex employed a compliance officer, Rachel McKinnon, to ensure the offers complied with applicable rules and regulations.

The LOC offers were marketed in a multi-step process, and in such a way that the disclosures come out a little at a time. The disclosures were often in dense compact text or text which is difficult to see, or the consumer had to scroll down on the screen or navigate to another page to read the disclosures. The initial ad would consist of a banner or email which would advertise an unsecured credit line, and the ad did not mention the offer was not for a traditional line of credit or that the credit line could be used only at the merchant's online store.

The landing pages, although different in minor details such as graphics and the name of the LOC, generally consisted of step one of the ordering process. The landing page would have in large and easy to read type "$7,500 credit line," and "0% interest." The landing page also often would have quotes from news sources such as Fox, CBS, and Forbes, about the importance of having credit. Sometimes the landing page also included the language "towards thousands of our merchandise items" under the larger, more prominent "$7,500 credit line." Other times, however, there was no mention of the fact that

the offer was not a general line of credit on the landing page. Additionally, the landing pages sometimes showed an image of what appeared to be a traditional credit card.

After submitting this information, the consumer would be taken to step two of the ordering process. This page looked almost exactly like the first page except the fields for entering personal contact information were changed to data entry fields to enter payment information for a nominal fee to activate the offer. Additionally, there was another box which the customer had to click in to indicate the customer read and agreed to the terms and conditions, privacy policy, and offer details. In small compact type beneath the submit button were the offer details, including the additional upsells. At no point was the consumer permitted to view the online store prior to submitting payment information.

Clicking on the link to the terms and conditions took the consumer to a separate terms and conditions web page. The terms and conditions page made certain disclosures, including that the line of credit was not a major credit card like Visa or Mastercard, the amount of the membership per month, and that it was a line of credit that could be used only at the LOC offer website. However, the consumer must click to a separate page to get these details, and they are contained in what appears at first glance to be similar to a traditional credit card's terms and conditions, including a table which is required of credit cards pursuant to 12 C.F.R. § 226.5a and Appendix G, indicating the interest rate, annual fee, and late charges.

Even though the offer contains some truthful statements, the key inquiry is whether the net impression is deceptive. No genuine issue of material fact remains that the LOC offers are deceptive. Defendants' fine print disclosures do not overcome their advertisements' deceptive net impression, including their inducement of initial contact through deception, even if consumers later could become fully informed. First, the LOC offers never disclosed that the line of credit was good only at Defendants' store on the banner ads and initial contact emails. Additionally, Defendants did not always make the

disclosure that the line of credit was good only at Defendants' online store on the landing page.  For those ads, the customer would learn about the offer details only by reading through the small type in the terms and conditions on a separate page after being lured in with promises of an unsecured credit line.

Even the offers that include the language "towards thousands of our merchandise items" are deceptive.  The net impression from the initial banner ad and the first landing page is that this is a traditional credit card.  The banner ads say nothing about an online shopping store.  The landing page does so only in smaller, often hard to see type that is buried by the larger, sensationalized text regarding the amount of credit, the zero percent interest, and the images of a traditional credit card.  It is not until step two that the consumer gets the offer details, and these are placed in small, compact type at the bottom of the page, where the consumer has to scroll down to see them.  Because the second web page is almost identical to the first page, the consumer likely is not looking for newly added terms and conditions on this page.  Additionally, the consumer is not permitted to view the online store before submitting payment information.  The high number of cancellations, refunds, and chargebacks suggest that in fact consumers were deceived about what they were ordering, and FTC offers the affidavits of several customers who aver they actually were deceived, as they thought they were getting a traditional line of credit.

Courts have found similar LOC offer schemes were deceptive as a matter of law. For example, in F.T.C. v. People's Credit First, LCC, the United States Court of Appeals for the Eleventh Circuit affirmed the district court's holding the defendant's ads were deceptive as a matter of law.  244 Fed. Appx. 942, 2007 WL 2071712 (11th Cir. July 19, 2007) (unpublished).  There, the defendants mailed out fliers to consumers telling them that for a $45 or $49 advance fee, they were guaranteed approval for a "First Platinum card with a credit line of $5,000.00."  Id. at 943.  Instead of a credit card, consumers received a membership to a shopping club.  Id.  The scheme resulted in hundreds of complaints to the

defendant and to the Better Business Bureau.  Id. at 943-44.  Consumers stated they thought they were receiving a traditional credit card like a Visa or Mastercard.  Id.  The Eleventh Circuit noted that the fact that the ads' words literally were true was not determinative, and the "material implication" of the ads was that the consumer would receive a credit card with a $5,000 credit line upon paying the advance fee.  Id.

The district court in the People's Credit case noted that the terms and conditions on the website indicated buyers would get a membership card, not a Visa or Mastercard.  F.T.C. v. People's Credit First, LLC, No. 8:03-CV-2353-T, 2005 WL 3468588 (M.D. Fla. Dec. 18, 2005) (unpublished).  Additionally, the defendants made "at least a passing effort to operate as a buyer's club," resulting in some sales over a four month period.  Id. at *3.  The court nonetheless ruled the mailers were deceptive as a matter of law.  Id.; see also F.T.C. v. Capital Choice Consumer Credit, Inc., No. 02-24050-CIV-UNGARO-GENAGES (S.D. Fla. Feb. 19, 2004) (unpublished) (Doc. #145-1) (holding direct mail ads to consumers with an approval certificate approving them for a credit line very similar to the scheme in People's Credit was deceptive as a matter of law).

Here, Defendants argue they never referred to the offer as a credit "card" as the defendants in People's Credit and Capital Choice did.  Nevertheless, the net impression remains the same, even if Defendants, some of whom were involved in the schemes in People's Credit and Capital Choice, learned a lesson from those cases and did not refer to a credit card but instead depicted an image of a credit card and called it a line of credit.  Pictures can make an offer deceptive even if other terms are disclosed in words.

The conclusion that Defendants' LOC offers were deceptive as a matter of law is further bolstered by the high cancellation, refund, and chargeback rates, as well as the exceptionally low orders from the store in comparison to the number of people signed up for the offer.  By the time the Receiver took over, 94% of those who signed up for the LOCs had cancelled.  Chargeback rates were around 15%, well above the 1% that will

trigger penalties under the Visa and Mastercard merchant chargeback monitoring programs.[3]  (Exs. Vol. 46 (Doc. #263-3) at 28-38; Exs. Vol. 45 (Doc. #262) at 227-33.)  The various LOC offers were on the Visa and Mastercard merchant chargeback monitoring programs, received fines after several successive months of excessive chargebacks, and Visa ultimately closed Global Gold's account for excessive chargebacks.  (Exs. Vol. 28 (Doc. #245), Ex. 803 at 5520.)

Visa and Mastercard took these actions despite the fact that Defendants used several different methods to avoid coming under scrutiny, including using many different company names, merchant accounts, and descriptors to avoid having all chargebacks tied to one company, and separating out the charges for the small up front activation fee and then charging higher monthly fees.  By separating the charges into multiple transactions, Defendants were able to affect the percent of chargebacks-to-transactions ratio, as customers are more likely to seek refunds on only the larger amounts.

Defendant M. Henriksen argues there is evidence that a 1% or even 2% chargeback rate is not that high, and he relies on the testimony of Whitney Guiffra ("Guiffra"), from ePayData, an independent sales organization which acts as a liaison between a merchant, the processor, and the settlement bank to accept electronic transactions.  (Exs. Vol. 27 (Doc. #244) at 135, 20.)  Guiffra's testimony does not raise a genuine issue of material fact.  There is no dispute that Visa and Mastercard have in place 1% chargeback thresholds for their monitoring programs, which in part are designed to detect fraud.  There also is no dispute that every one of Defendants' offers exceeded that rate.  Many of the LOC offers were over 3%, and one reached as high 10.87%.  (Exs. Vol. 45, Ex.

---

[3] Basically, the merchant chargeback monitoring programs run by Visa and Mastercard identify merchants who exceed a chargeback rate of about 1% in any given month.  The merchant is given an opportunity to correct the issue, but for each successive month, Visa and Mastercard progressively escalate their response, from increasing monetary penalties to eventually closing the merchant's account.

830 at FTC-9051-52; Exs. Vol. 46, Ex. 910 at FTC-9209.)  Further, the high number of refunds and cancellations further bolsters the chargeback rates as evidence of customer confusion.

The lack of orders from the online store also shows consumers thought they were receiving a traditional credit card.  Customers placed only about 400 orders per month despite the fact that Defendants claim to have signed up over 400,000 members.  Global Gold's profit and loss statements show it spent approximately $252,000 in fulfillment costs from April 2008 through March 2009.  (Exs. Vol. 19 (Doc. #236-3) at 98.)  During this same period, Global Gold reports over $12.5 million in membership sales.  (Id.)  In the face of giving out over 400,000 lines of credit in amounts of $5,000 or $7,500, S. Henriksen did not have a line of credit to support the extension of so much credit to others, thus suggesting he knew very few people who signed up actually would purchase anything from the store.  (Exs. Vol. 33 (Doc. #250) at 4039-40.)

The fact that there were some satisfied customers and only a few customers contacted the Better Business Bureau rather than just cancelling or getting a refund or a chargeback do not raise genuine issues of material fact.  It is irrelevant if there are satisfied customers.  The test is whether the ad is likely to deceive a reasonable consumer.  That there may have been some satisfied customers (a dubious proposition as the only support Defendants provide are hearsay comments with no supporting proof of actual customer satisfaction) does not undermine the other facts of deception and overwhelming customer dissatisfaction as shown by the high cancellation, refund, and chargeback rates.  Moreover, FTC has presented evidence that the so-called satisfied customers who offered testimonials[4] canceled within one or two billing periods.  (Opp'n to Mot. Summ. J. (Doc. #296), Ex. 913.)  By the time the Receiver stepped in, 94% of LOC customers had cancelled their memberships.  (Exs. Vol. 14 (Doc. #74) at 14.)

---

[4]   Defendants have presented no evidence the testimonials were genuine.

Defendants contend the chargeback rates are explained by the phenomenon of "friendly fraud," which generally refers to the concept that consumers are now aware they can do chargebacks, and they do so even when they ordered the product in question and received what they ordered. But Defendants present no evidence that a single chargeback was the result of friendly fraud. Moreover, the high refund and cancellation rates support the conclusion that the high chargeback rates were not the product of friendly fraud.

Defendants also argue that genuine issues of material fact remain regarding the individual Defendants' scienter because Defendants obtained an opinion letter from an attorney advising that the LOC offers were not deceptive and they employed a compliance officer to ensure compliance with federal law. As set forth in the Preliminary Injunction and Second Preliminary Injunction, FTC has presented evidence supporting a finding of the requisite level of scienter for each of the individual Defendants. (Prelim. Inj. (Doc. #83) at 15-18; Second Prelim. Inj. (Doc. #165) at 4-13.) The attorney opinion letter does not raise a genuine issue of material fact as to the individual Defendants' scienter. It is not clear from the record what the attorney was shown or was told about the offer for which he was providing his opinion. (See Opp'n to Mot. Summ. J. (Doc. #305), Ex. I.) Thus, it is not clear from the record that Defendants relied on the opinion letter for any specific web page that appeared on the Internet. To the extent the attorney approved the LOC offers as they actually were marketed, he was incorrect in his opinion regarding the offers' deceptiveness. Given the way the LOCs were marketed, combined with the high cancellation, refund, and chargeback rates, Defendants were at least recklessly indifferent as to the deceptive nature of the offers even if they previously had obtained an attorney opinion letter. Defendants could not continue to rely on the attorney opinion letter in the face of compelling evidence of consumer confusion without being recklessly indifferent to the misleading nature of their ads, or being aware of a high probability of fraud but intentionally avoiding the truth.

///

33

Although Defendants, through Vantex, hired a purported compliance officer, Rachel McKinnon ("McKinnon"), this does not raise a genuine issue of material fact regarding scienter.  McKinnon testified she had no prior regulatory compliance experience, and there is evidence that some of her suggestions to management to take down misleading web pages were ignored.  (Exs. Vol. 42 (Doc. #259) at 99.)  At any rate, as with the attorney opinion letter, to the extent McKinnon opined these offers were not deceptive, she was incorrect and Defendants had other indicators that their marketing was deceptive. Defendants therefore do not raise a genuine issue of material fact regarding scienter based on their purported reliance on an inexperienced compliance officer whose advice was rejected, and in the face of other indicators of deceptiveness.

No genuine issue of material fact remains that the LOC offers were deceptive and that the individual Defendants acted with the requisite scienter.[5]  The Court therefore will grant summary judgment in favor of FTC on count two.

### E.  Count Three - Failure to Disclose Terms of LOC

Count three alleges Defendants failed to disclose material terms of the LOC offers.  Specifically, FTC contends Defendants failed to disclose consumers would be joining an online shopping club, the LOC could be used only at Defendants' online shopping club, the LOC could not be used to purchase all items at the shopping club because some items require a substantial deposit, and other fees and charges would apply. Defendants respond that all terms were disclosed in the offer details and terms and conditions.

The failure to disclose that consumers would be joining an online shopping club and that the LOC could be used only at Defendants' online shopping club are duplicative of count two.  As to the unique claims in count three, FTC is entitled to summary judgment

---

[5] Although Defendants explicitly challenge scienter only with respect to count two, the Court's prior findings in support of the Preliminary Injunctions support a finding of scienter for all offers.

based on Defendants' failure to disclose that a down payment would be required for most items. Most items at the online store required a deposit by the consumer, and thus the consumer could not buy the item entirely on credit. (Exs. Vol. 45 at 156 ("Most products have a down payment, and then we will, you know, extend credit for the other ones."); see also Exs. Vol. 21 (Doc. #238-1) (list of orders which shows nearly every order required at least some down payment).) Not until item 20 on the terms and conditions page is there a statement that a "deposit of the total merchandise purchased is required for some items and actual and shipping and processing charges. . . . Many items are $0.00 down items." (Exs. Vol. 21 (Doc. #238-2) at 4.) This did not disclose that most items will require a deposit.

FTC also is entitled to summary judgment that the LOC offers fail to disclose that there are additional fees associated with the membership. A recurring $39.95 per month membership fee was not adequately disclosed because it was buried in the terms and conditions and in the fine print on the step two order page. Similar to the negative option upsells discussed below, the customer initially was told that all they had to pay was a small activation fee, usually $2.78. Only in small compact print under the submit payment information button was it revealed that the customer would have to pay a recurring $39.95 per month fee if they did not cancel. The terms and conditions web page revealed this recurring charge, but the customer had to navigate to the terms and conditions page to find that information. As discussed more fully below with respect to the negative option upsells in count seven, Defendants did not adequately disclose this term by burying it in fine print where the customer would have to scroll down to see it or navigate to another page containing the terms and conditions to find it, particularly where neither the banner nor the landing page suggested there would be any additional cost.

No genuine issue of material fact remains that the LOC offers failed to disclose a deposit would be required for most items and that additional fees applied to the membership. The Court therefore will grant summary judgment in favor of FTC on count

three.

**F.  Count Four - Misrepresentations in Work-From-Home Schemes**

Count four alleges Defendants misrepresented the earnings potential in relation to work-at-home business opportunities.  FTC argues no genuine issue of fact remains that Defendants had no evidence to substantiate the projected earnings they advertised to consumers.  Defendants contend the statements were just examples or projections of what a person could make, but Defendants did not promise or guarantee any such returns.

1.  One Hour Wealth Builder/Domain Processing

Paid to Process ("PTP"), a S. Henriksen-owned company, owned the offers One Hour Wealth Builder and Domain Processing.  (PTP's Mot. Summ. J. (Doc. #273), Ex. A at 75.)  One Hour Wealth Builder and Domain Processing are two work-from-home opportunities that purport to teach consumers how to buy and sell domain names on the Internet for a profit.  The two programs are substantively the same, just sold under different names.  One Hour Wealth Builder's website offer stated it would provide users access to tutorials and articles on how to make "1,000's per month on the Internet flipping domain names." (Pl.'s Mot., Ex. 13.)  Key language suggested that consumers will make at least $45 per domain name:

> With our method, processing a single domain takes only 15 minutes out of your day.  Making at least $45 per domain, you can process four or more domains in an hour and make more than $180!  That means in just a few hours a day you can make a week's salary, and in a full work-week you can earn more than what most people make in a month!  Follow our earnings chart to see examples of how much you can make:

(Am. Compl., Ex. 578.)  A chart was then set forth showing how much money consumers could make at $45 per domain name for each day, week, month, and year if they processed 6, 8, 10, 12, or 15 domains per day at $45 each.

No evidence in the record raises a genuine issue of material fact that Defendants had any basis for suggesting consumers could sell domain names for $45 each or that any

consumer using the service made anything close to the numbers in the chart.  While Defendants argue the chart is mere puffery as to what someone theoretically could make, the offer was phrased to suggest a consumer would "[m]ak[e] at least $45 per domain." Contrary to this representation, the evidence before the Court shows consumers made little to no money before cancelling, requesting refunds, or getting chargebacks on these offers.

Defendants argue they would not have documents establishing what customers made with their products, as only the customers would have that kind of documentation, and Defendants have no right to possess that information.  Defendants contend the only substantiation required is the use of testimonials by the customers.  Even if Defendants were correct as a matter of principle, Defendants have not presented any evidence that a single testimonial is genuine (an actual customer gave the testimonial), much less truthful in its representations (the customer actually made money flipping domain names).  The Receiver found no such evidence.  In PTP's joint reply (Doc. #319), Defendants present another testimonial and the tax return of PTP's original owner as purported substantiation of the earnings chart.  These items do not raise an issue of fact even if the Court overlooked Defendants' failure to produce these exhibits in opposition to FTC's motion.  The new testimonial is hearsay with no evidence, such as an affidavit from the individual, that the testimonial is genuine.  As to the tax return, it does not indicate how the prior owner made his income, and thus there is no way to determine how much of his income came from selling domain names.  Even if both of these pieces of evidence were admissible and showed what Defendants claim they show, the fact that two people were able to make money selling domain names does not provide a basis for the earnings chart's claim that consumers could expect to make at least $45 per domain name.

Defendants must have some basis for making the earnings claim, and if they have no such basis, they cannot fabricate a number and then fall back on the defense that they would not have access to documentation to support the claim.  FTC is entitled to summary

judgment on count four as to the unsubstantiated earnings claims in the One Hour Wealth Builder and Domain Processing offers.

### 2.  My Search Cash

My Search Cash ("MSC") was an educational tool to learn how to sell items on eBay and Google.  The advertising contained language such as "big money waiting" or "make big money through Google and eBay."  While the Court agrees this language is non-actionable puffery, a more problematic representation is that "Riches range from a few hundred dollars a month to $50,000 or more a year!"  There is no evidence in the record that MSC had any basis on which to make such a claim, and the Receiver located nothing in MSC's records to substantiate the potential earnings claim.  (Exs. Vol. 45, Ex. 831.)  The evidence available suggests that consumers made little to no money before cancelling, requesting refunds, or getting chargebacks on MSC.  MSC also advertised testimonials from an individual who claimed to make thousands of dollars using the program, and another who claimed to make over $500 a day.  Defendants present no evidence the testimonials were genuine.

Defendants must have some basis for making the potential earnings claim, but Defendants point to no admissible evidence in the record raising a genuine issue of fact that they had a basis for making the claim.  FTC is entitled to summary judgment on count four as to the unsubstantiated potential earnings claim for MSC.

### G.  Count Five - Misrepresentations in Acai Total Burn

Count five alleges Defendants made misrepresentations concerning Acai Total Burn's health benefits, as well as misrepresenting that Oprah and Rachel Ray endorsed the product.  FTC argues that its exhibit 579 is an example of Defendants' web page offering Acai Total Burn, and that Defendants advertised phony celebrity endorsements and unsubstantiated medical claims for the product as shown in exhibit 579.  Defendants argue FTC's claim is based entirely on exhibit 579, which Defendants contend never was a live

web page on the Internet, and thus consumers never saw the alleged misrepresentations.

Acai, Inc., owned by S. Henriksen, sold a product called Acai Total Burn, a supplement that contained acai as well as other substances.  (Acai, Inc.'s Mot. Summ. J. (Doc. #270), Ex. A at 286.)  Carol Jones, an FTC investigator, states in her affidavit that she viewed the website at www.acaitotalburnoffer.com and exhibit 579 fairly and accurately depicts the site as she viewed it.  (Exs. Vol. 46, Ex. 906.)

Exhibit 579 appears to be a web page marketing Acai Total Burn, although it is unclear from the exhibit whether it was ever live on the Internet.  The offer makes the following representations:

> Why Use Acai Total Burn?
> Highest Antioxidants of any Food!
> #1 Weight Loss Supplement of 2008!
> Oprah and Rachel Ray Approved
> Helps Increase Your Metabolism
> Fight Fatigue & Increase Energy
> Slows down the aging process

(Exs. Vol. 16 (Doc. #144) at 6.)  There is no evidence that Acai Total Burn has the highest antioxidants of any food, was the number one weight loss supplement of 2008, increases metabolism, fights fatigue, increases energy, or slows down the aging process.  FTC presented evidence from a doctor that none of the health benefit claims have any basis in scientific fact.  (Exs. Vol. 23 (Doc. #240-1), Ex. 796.)  Oprah's company and Rachel Ray have submitted affidavits that they did not endorse any acai product.  (Id., Exs. 787-88.)

The S. Henriksen Defendants admitted in their Answer that "certain marketing material for Acai Total Burn include language set forth in . . . paragraph 64 [of Plaintiff's Amended Complaint]."  (Ans. (Doc. #163 at ¶ 64).)  Paragraph 64 of Plaintiff's Amended Complaint sets out the above representations.  However, at his deposition, S. Henriksen denied that Acai Total Burn marketing referred to approval by Oprah or Rachel Ray or claimed that it was the number one weight loss supplement of 2008.  (Opp'n to Mot. Summ. J. (Doc. #305), S. Henriksen Dep. at 305.)  S. Henriksen identified FTC exhibit 579 as a

marketing page for Acai Total Burn created by Vantex, but he testified that Vantex did not market Acai Total Burn.  (Id. at 286-87.)  According to S. Henriksen, Acai Total Burn was marketed exclusively by Virgin Offers Media, and therefore exhibit 579 "would not have been used."  (Id. at 287.)  Vantex/Dragon employee Jason Soto also testified that he did not think exhibit 579 ever went live on the Internet.  (Exs. Vol. 41 (Doc. #258), Ex. 823 at 239-40.)  On an application for third party funding, S. Henriksen identified Virgin Offers Media as the entity providing campaign services for Acai Total Burn.  (Exs. Vol. 22 (Doc. #239), Ex. 755.)  However, FTC's exhibit 644 shows an acai ad on www.vantexgroup.com.  (Exs. Vol. 19 (Doc. #236), Ex. 644.)  Given the conflicting evidence on whether exhibit 579 or an ad making similar claims ever was offered to consumers on the Internet, a genuine issue of material fact remains as to whether Defendants marketed Acai Total Burn deceptively with respect to claims related to being Oprah or Rachel Ray approved, or whether it was the number one weight loss supplement of 2008.

However, in their Answer, Defendants admitted to making the other health benefits claims about Acai Total Burn and Defendants have not presented any evidence raising an issue of fact that they did not make these other health benefit claims regarding the product.  There is no evidence Defendants had any scientific basis to claim that Acai Total Burn had the highest antioxidants of any food, helped to increase metabolism, fought fatigue, increased energy, or slowed down the aging process.  As to the health benefits claims for Acai Total Burn, FTC is entitled to summary judgment on count five.

### H.  Count Six - Fake Testimonials & Endorsements

Count six alleges Defendants used phony testimonials and endorsements from both members of the public and celebrities.  FTC argues there is no evidence any of the testimonials on the various offers were legitimate.  Defendants respond that the testimonials are genuine.

///

As discussed previously, an issue of fact remains as to whether Defendants used Oprah and Rachel Ray testimonials to market Acai Total Burn. The Court therefore denies summary judgment to FTC on this count as to the use of celebrity endorsements for Acai Total Burn.

As to non-celebrity endorsements, however, FTC is entitled to summary judgment. The Receiver has not found evidence supporting the non-celebrity testimonials for the other products. (Exs. Vol. 45, Ex. 831 at ¶ 7.) The same testimonials were used no matter which website Defendants were using for a particular offer. For example, Defendants used testimonials for Grant Connect before Grant Connect had its first customer. In another example, one individual gave the same testimonial for two different credit amounts on the LOC offers. In one testimonial, A. Harris claimed he or she received a $7500 credit line, but in another A. Harris claimed he or she received a $9500 credit line. (Compare Pl.'s Mot., Ex. 6 at 18, with S. Henriksen Opp'n to Prelim. Inj., Ex. E at slide 8.) Nadia Mikhail, FTC paralegal specialist, avers in her affidavit that she could find only one individual whose testimonial was presented on the work-from-home landing pages who was even a customer of Defendants as reflected by Defendants' own records. (Exs. Vol. 46 at 26.)

Defendants have not presented any evidence that any of the testimonials are genuine. Defendants present some testimonials but do so in hearsay form, with no admissible supporting documentation such as an affidavit from the identified individual indicating that he or she gave the testimonial presented and that it was accurate. (See S. Henriksen Entities' Opp'n to FTC's Mot. Summ. J. (Doc. #305).) Defendants O'Connell and Gray rely on release forms where certain individuals in relation to the grant offer agreed to the use of their testimonial and expressed that the statements in the testimonial were true. (O'Connell's & Gray's Opp'n to FTC's Mot. Summ. J. (Doc. #306), Ex. 2.) However, Defendants present no evidence these releases are genuine. Several Defendants admitted

they did nothing to verify any of the testimonials, and Vantex's compliance officer, McKinnon, also testified she did not contact any customers to verify the testimonials.

Defendants fail to present any admissible evidence raising a genuine issue of material fact that any of the non-celebrity testimonials are genuine or accurate. FTC therefore is entitled to summary judgment on count six.

### I. Count Seven - Failure to Disclose Upsells

Count seven alleges Defendants failed to disclose the negative option upsells. FTC argues the upsells were not adequately disclosed because they were in small print and consumers had to scroll down on the web page to see the disclosures, or the disclosures otherwise were buried in the terms and conditions on a separate web page. Defendants respond that the upsells were fully disclosed and consumers were required to indicate they had read the terms and conditions prior to being charged.

Each of the primary offers were bundled with upsells. When a consumer purchased one of the LOC offers, they automatically were enrolled in two or three other offers, usually Vcomm, Smarthealth Gold, or Premier (an office software suite). Likewise, when a consumer purchased Grant Connect, he or she automatically was enrolled in upsells, including MemberLegalNet. When a consumer purchased Acai Total Burn, he or she also received upsells for Total Health and Healthy Allure. The upsells were not disclosed in the banner or on the landing page. Rather, they were disclosed in two places: under the button the consumer would click on to submit payment information in step two of the ordering process, and on the terms and conditions page. The text on step two of the ordering process was in small compact type under the submit button, and the consumer would have to scroll down to see it. Because it was hidden from view and because the step two page looked almost identical to the step one page, consumers were unlikely to see it.

Although the terms and conditions page typically, though not always, fully disclosed the upsells' terms, a consumer should not have to view the terms and conditions

42

on a separate web page to learn they are being charged for two or three recurring monthly membership charges unrelated to the product they actually ordered and which they did not request.  Moreover, the disclosure relating to the upsells does not appear until paragraph 23 of dense small text in the terms and conditions.  The terms and conditions sometimes did not tell the consumer what the upsells cost, and/or referred them to the upsell offer's website to get information on the upsells.

Consumers have averred they did not see the upsell offer details and were surprised to discover their enrollment in membership programs they had never heard of until they noticed the charges on their credit card statements.  The high number of refunds, cancellations, and chargebacks on the upsell offers suggest these offers were inadequately disclosed.  Vcomm, for example, was a long distance calling service that was sold only as an upsell on S. Henriksen's other offers.  Vcomm had a chargeback ratio of 4.09% and was in Visa's merchant chargeback monitoring program for eight consecutive months using four different descriptors.  (Exs. Vol. 46, Ex. 910 at FTC-9211.)  Vcomm also was in Mastercard's merchant chargeback monitoring program for seven months with an average chargeback ratio of 1.69% for one merchant identification number, for five months with a chargeback ratio of 1.81% for another merchant identification number, and for four months with a ratio of 1.63% for a third merchant identification number.  (Exs. Vol. 45, Ex. 833 at FTC-9053-54.)

From January through December 2008, Vcomm made over $5 million dollars, yet it expended only $2,000 in fulfillment costs.  (Exs. Vol. 36 (Doc. #253), Ex. 813 at 7341-48.)  Vcomm's other expenses consisted entirely of commissions to Global Gold for marketing Vcomm, fees to operate the merchant account, fees to the credit card processors, customer service expense, and fees to Defendant OS Marketing for use of AWARE.  (Id.) M. Henriksen contends Vcomm also spent $55,667.25 in "telephone & related" expenses and $25,500 for "web programming and hosting."  (Exs. Vol. 20 (Doc. #237), Ex. 656.)  It

is unclear whether the web programming was payment to Vantex for advertising or whether it was actual service to consumers for use of the product, although it is listed as a research and development expense.  It also is unclear whether the telephone expenses were actual customer fulfillment costs or the cost to Vcomm for its own business telephone system. Nevertheless, even including these amounts, the fulfillment costs are grossly disproportionate to the memberships.  Although M. Henriksen contends the over $240,000 spent on customer service should count as fulfillment costs, it is telling that Vcomm spent approximately three times more money on customer service than it did on the actual product for the customer, even including the approximately $75,000 in telephone and web programming expenses.

Premier was an office software suite which also was sold only as an upsell. Premier was in Mastercard's merchant chargeback monitoring program for three months with an average chargeback ratio of 4.36%.  (Exs. Vol. 45, Ex. 833 at FTC-9053.)  Grant Connect was offered as an upsell on the LOCs for a while, and it had even higher chargeback ratios, despite being spread out over several descriptors and merchant identification numbers.  (Id. at FTC-9054-55 (showing different iterations of the grant offer through Horizon Holdings were on Mastercard's monitoring program for 4 months with 4.70% chargeback; 4 months with 5.66% chargeback; 4 months with 5.76% chargeback; 4 months with 5.32% chargeback, and four months with 5.06% chargeback).)  Some of these chargebacks likely were the result of Grant Connect being a primary offer as well as an upsell.  But the chargeback rates associated with the other upsells, along with the customer complaints, cancellations, and refunds demonstrate consumer confusion associated with the upsells.

Defendants argue the upsells complied with FTC's own five principles of negative option marketing: (1) disclose material terms in an understandable manner, (2) make the appearance of disclosures clear and conspicuous, (3) disclose material terms

44

before the consumer incurs a financial obligation, (4) obtain consumers' affirmative consent to the offer, and (5) do not impede cancellation.  However, the upsells were not clear and conspicuous.  Because they were not clear and conspicuous, Defendants did not obtain consumers' affirmative consent.  Further, Defendants impeded cancellation by making consumers call separately to cancel each offer, even though all calls were answered out of the same customer service center.  The primary offer websites also referred consumers to the upsell websites to learn how to cancel those offers instead of providing cancellation information at the primary offer's website.

Defendants deceptively marketed the upsells as a matter of law.  The Court therefore will grant FTC's motion for summary judgment on count seven.

### J.  Count Eight - Unauthorized Debiting of Consumers' Bank Accounts

Count eight alleges Defendants debited consumers' bank accounts without written authorization or its equivalent.  FTC relies upon the affidavits of several consumers who state that they did not become aware of their membership in certain upsells until they saw the charges on their credit card statements, and they did not agree to be charged for these items.  Defendants respond that they had written authorization for all charges as demonstrated by the fact that consumers had to click in the box that they had read all terms and conditions, which included acceptance of the upsells.  Defendants also contend they sent emails to consumers confirming their enrollment.

The EFTA provides that a "preauthorized electronic fund transfer from a consumer's account may be authorized by the consumer only in writing, and a copy of such authorization shall be provided to the consumer when made." 15 U.S.C. § 1693e(a).  An electronic fund transfer is unauthorized if it is a "transfer from a consumer's account initiated by a person other than the consumer without actual authority to initiate such transfer and from which the consumer receives no benefit." Id. § 1693a(11).  Pursuant to its regulatory authority, the Board of Governors of the Federal Reserve System issued

Regulation E to carry out the purposes of the EFTA.  12 C.F.R. § 250.1 et seq.  Pursuant to Regulation E, preauthorized electronic fund transfers from a consumer's account "may be authorized only by a writing signed or similarly authenticated by the consumer.  The person that obtains the authorization shall provide a copy to the consumer." 12 C.F.R. § 205.10(b).  A preauthorized electronic fund transfer is "an electronic fund transfer authorized in advance to recur at substantially regular intervals." Id. § 205.2(k).

In his declaration, consumer James Zvolensky ("Zvolensky") states that he thought he was getting a Visa card through Defendants LOC offer, but once he learned it was for an online store, he called to cancel.  (Pl.'s Mot., Ex. 382.)  Zvolensky avers that he never noticed any information about additional fees or charges when he applied for the LOC, and did not become aware of the upsell charges until he noticed charges on his credit card bill for an identification protection service and Vcomm.  Doris Loiseau ("Loiseau") makes similar averments regarding Grant Connect.  (Id., Ex. 383.)  Loiseau states she thought she would be charged only $2.29 for shipping a CD to her, but she was enrolled in SmartHealth Gold, MemberLegalNet, and IDPro Alert.  She called to cancel these services, and was surprised to be charged $39.95 for the Grant Connect membership.

Consumer William Fields states that he signed up for Grant Connect and did not notice anything advising him that he would be signed up for additional memberships.  (Ex. 385 (Pl.'s Mot., Ex. 385.)  He was charged for ID Lock and MemberLegalNet, but he avers he did not agree to join these programs.  Finally, Ronald Rauscher made similar claims regarding Grant Connect.  (Id., Ex. 386.)  He stated he did not see anything about any fees other than $1.99 for shipping the Grant Connect CD.  He avers he did not realize Grant Connect would continue to charge his card, and he was signed up for ID Pro Alert without his knowledge.

In response to this evidence, Defendants rely on their common practice of requiring consumers to click on the box indicating they read the terms and conditions prior

to submitting financial data.  Defendants also rely on their regular practice of sending confirmation emails to the customer showing that they agreed to be enrolled in these programs.  Defendants do not point to evidence that they actually sent such emails to any of the identified individuals, although there is evidence in the record that at least some consumers received confirmation emails.  (Pl.'s Mot., Exs. 379, 383, 392, 393.)

There is no evidence that Defendants provided a copy of the authorization to the consumer.  Although Defendants claim they sent confirmation emails, the evidence shows only that Defendants provided an email welcoming the consumer to the membership program and indicated through what IP address the membership was purchased.  (Pl.'s Mot., Attachs. to Exs. 379, 383, 392, 393.)  The confirmation emails did not set forth the terms of the authorization for recurring charges, such as the amount the consumer would be charged and at what interval.  See 12 C.F.R. Part 250, Supp. I, 10(b) cmt. 5 ("The person that obtains the authorization must provide a copy of the terms of the authorization to the consumer either electronically or in paper form.").  Additionally, because Defendants deceptively marketed the upsells, as discussed above, the fact that the consumer was about to be enrolled in several memberships with recurring monthly charges was not adequately disclosed.  See 12 C.F.R. Part 250, Supp. I, 10(b) cmt. 6 ("An authorization is valid if it is readily identifiable as such and the terms of the preauthorized transfer are clear and readily understandable.").  Defendants' failure to adequately disclose is shown by consumer affidavits indicating consumers did not realize they had been enrolled in the upsell offers until they noticed the charges on their credit card statements.

Defendants have failed to present evidence raising a genuine issue of material fact that the preauthorization transfer terms were clear and readily understandable, or that they provided the consumer with a copy of the authorization for the recurring charges.  The Court therefore will grant FTC's motion for summary judgment on count eight.

///

**K.  Relief Requested**

FTC requests permanent injunctive relief in the form of enjoining Defendants from engaging in negative option marketing, continuity programs, preauthorized electronic fund transfers, or the use of testimonials.  FTC also seeks a permanent ban on Defendants marketing and selling products related to grants, credit, business opportunities, and diet supplements or nutraceuticals.  FTC also seeks equitable monetary relief in a total amount across all offers of $29,784,770.52, plus pre-judgement interest.

1.  Injunctive Relief

FTC may seek a permanent injunction as a remedy for violations of the Act.  15 U.S.C. § 53(b) (stating that "in proper cases the Commission may seek, and after proper proof, the court may issue, a permanent injunction").  The Court may deem a defendant's "ready willingness to flout the law" as "sufficient cause for concern regarding further, additional violations" for which injunctive relief may be appropriate.  Sears, Roebuck & Co. v. F.T.C., 676 F.2d 385, 392 (9th Cir. 1982).  In assessing the relief to be fashioned, the Court may consider such factors as "the deliberateness and seriousness of the present violation, and the violator's past record with respect to unfair advertising practices," as well as "the adaptability or transferability of the unfair practice to other products."  Id.  The Court should evaluate "the circumstances as a whole" to determine the appropriate relief.  Id.  A permanent ban on engaging in certain activities is an option open to the Court.  15 U.S.C. § 53(b); F.T.C. v. Gill, 265 F.3d 944, 954, 957-58 (9th Cir. 2001) (affirming the district court's permanent ban on the defendant engaging in the credit repair business).

The Court concludes FTC has presented evidence supporting injunctive relief in the form of a permanent ban barring Defendants from (1) engaging in negative option marketing, continuity programs, preauthorized electronic fund transfers, or the use of testimonials, and (2) marketing and selling products related to grants, credit, business opportunities, and diet supplements or nutraceuticals.  Repeat offender Kyle Kimoto

previously was involved in a similar credit card scheme in <u>Assail</u>,[6] conduct for which he currently is incarcerated and for which he was under investigation and faced criminal charges during part of the time he engaged in the conduct at issue in this case.[7]

Defendants S. Henriksen and M. Henriksen technically are not repeat offenders in the same way as Kyle Kimoto. S. Henriksen's prior contact with FTC involved his violation of the preliminary injunction in the <u>Assail</u> case moving money for Kyle Kimoto, not for false advertising. M. Henriksen entered into a stipulated ban on telemarketing, but did not admit to any wrongdoing in <u>Assail</u>. Nevertheless, their prior contact with FTC put them on greater notice than someone who had no prior contact with FTC. Defendant Tasha Jn Paul also is in the midst of several cases involving FTC. Likewise, Defendant Rachael Cook ("Cook") had no prior contact with FTC. However, she was aware of the allegations in the <u>Assail</u> case and yet associated herself with the same individuals in an internet marketing scheme bearing a resemblance to the allegations in <u>Assail</u>. Cook makes no arguments on her behalf in opposition to the permanent ban.

Defendants' readiness to flout the law, the extensive nature of the activity, and the adaptability of Defendants' methods to other products counsel in favor of permanent injunctive relief as to the individual Defendants. Defendants created numerous offers, all using the same deceptive strategies resulting in millions of dollars in consumer injury. All Defendants were willing to flout the law to offer the deceptive grant product which no Defendant attempts to defend as a legitimate product. All Defendants also participated in the deceptively marketed negative option upsells, including products of dubious value or

---

[6] <u>F.T.C. v. Assail, Inc.</u>, No. W03CA007 (W.D. Tex. 2003); <u>F.T.C. v. Assail, Inc.</u>, No. 2:04-CV-00895-JCM-RJJ (D. Nev. 2003).

[7] Kyle Kimoto opposes the lifetime ban from engaging in certain activities as a violation of the Thirteenth Amendment. Prohibiting Kyle Kimoto from engaging in certain activities does not constitute involuntary servitude.

legitimacy.[8]  Defendants were willing participants in the efforts to take measures to avoid detection under the merchant chargeback programs.

Given Defendants' recidivism, extensive misconduct, willingness to flout the law, and highly adaptable scheme, the Court concludes permanent injunctive relief is appropriate.  The Court therefore will grant FTC's Motion for Summary Judgment seeking a permanent ban on the individual Defendants' conduct as set forth more completely in a separate Order filed concurrently with this Order.

## 2.  Damages

"To determine the appropriate amount of damages in deceptive advertising cases, courts apply a burden-shifting scheme."  F.T.C. v. Direct Mktg. Concepts, Inc., 624 F.3d 1, 15 (1st Cir. 2010).  FTC bears the initial burden of providing "a reasonable approximation of damages," which may be established by gross receipts, net customer loss, or other comparable evidence.  Id.  If FTC meets this burden, "the defendant has an opportunity to demonstrate that the figures are inaccurate."  Id.; F.T.C. v. QT, Inc., 512 F.3d 858, 864 (7th Cir. 2008) (stating that "if defendants thought that their profits for these years were below $16 million, they should have produced their own figures-for once the FTC produces a reasonable estimate, the defendants bear the burden of showing that the estimate is inaccurate").

FTC has presented evidence of consumer injury totaling $29,784,770.52.  Defendant M. Henriksen challenges FTC's showing, arguing that two FTC employees and the Receiver arrived at three different calculations of net sales for the LOC offers, and thus as a matter of law there is no reliable evidence on which to award damages.

Pursuant to FTC data analyst Andrew Dale's ("Dale") extraction of data from the AWARE database, the LOC offers made a net profit of $18,794,478.92 (total sales less

---

[8]  For example, Defendants O'Connell and Gray owned MemberLegalNet, a purported provider of discount legal services.  Neither O'Connell nor Gray were licensed attorneys.

chargebacks and refunds), the work-from-home offers made $1,492,098.59, Grant Connect

made $2,263,597.11, and Acai Total Burn made $8,333.48.  (Exs. Vol. 45, Ex. 830 at

9030.)  Because a computer error wiped out the AWARE data for Vcomm and Allclear,

Dale used the Receiver's Report to estimate Vcomm's net sales at $7,226,262.42.  (Id. at

¶ 6 & 9030.)  Dale calculated numbers through July 30, 2009, as that is when the Receiver

took over.  (Id. at ¶ 8.)  Kenneth Kelly ("Kelly"), another FTC employee, calculated net

sales for the various offers and generated the same numbers.  (Exs. Vol. 46, Ex. 911.)

However, Radu Pisano ("Pisano"), another FTC employee, calculated a slightly

higher amount of sales for the LOC offers.  (Exs. Vol. 14, Ex. 527, Attach. C.)  Pisano

calculated the numbers through August 2, 2009.  (Id., Ex. 527 at ¶ 32.)  Both Dale and

Pisano used the AWARE system to extract the data.  The Receiver reports a substantially

lower amount in sales, around $15 million.  (Receiver's Report (Doc. #82).)  However, the

Receiver reported only through June 2009, and used the merchant accounts as the data

source, not AWARE.

The difference in net sales which M. Henriksen notes is attributable to the

difference in time frames analyzed and the source from which the data was culled.  To the

extent there is a discrepancy between these numbers, FTC relies on Dale's calculation

because Dale used Defendants' own records and capped the calculation at the time the

Receiver took over.  As to the missing data for Vcomm, FTC provides a backup source of

data in the form of the Receiver's Report.  The Receiver used the merchant account data, a

reliable source for information regarding the sales.  FTC has presented a reasonable

approximation of damages.  Defendants have presented nothing to suggest the figures are

inaccurate or unreliable.  FTC therefore is entitled to equitable monetary relief in the

amount of $29,784,770.52.

///

///

3.  Prejudgment Interest

The Court may award prejudgment interest as part of the relief.  See QT, Inc., 512 F.3d at 864; F.T.C. v. Atlantex Assocs., 872 F.2d 966, 969 (11th Cir. 1989) (awarding pre-judgment interest lies within district court's discretion).  "[A]n award of prejudgment interest under the FTC Act furthers the purposes of the statute by encouraging businesses who are found to have participated in unfair or deceptive acts or practices to settle with its consumers (through the FTC) quickly and fairly, thereby avoiding lengthy litigation." F.T.C. v. Nat'l Bus. Consultants, Inc., 781 F. Supp. 1136, 1144 (E.D. La. 1991).  Generally, interest on a money judgment in a federal court is "calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding[] the date of the judgment," and is compounded annually.  28 U.S.C. § 1961(a) (footnote omitted), id. § 1961(b); U.S. v. Gordon, 393 F.3d 1044, 1058 n.12 (9th Cir. 2004) ("Under federal law the rate of prejudgment interest is the Treasury Bill rate as defined in 28 U.S.C. § 1961 unless the district court finds on substantial evidence that a different prejudgment interest rate is appropriate.").

FTC employee Kelly presents a table with prejudgment interest calculations. (Exs. Vol. 46, Ex. 911.)  Kelly determined a 4.4% interest was "appropriate."  Kelly calculated the amounts using both simple interest and, alternatively, compounding monthly for each month through the end of December 2011.

Defendants have presented no law or argument as to why the Court should not award pre-judgment interest other than M. Henriksen's argument that FTC seeks excessive pre-judgment interest.  The Court, in its discretion, will award pre-judgment interest. However, the Court rejects FTC's proposed 4.4% pre-judgment interest rate.  Kelly gives no basis for choosing this number, and FTC has presented no argument as to why the Court should deviate from the usual statutory rule regarding the prejudgment interest rate.  The

Court therefore will award pre-judgment interest, but only at the usual statutory rate, compounded annually.  The Court will direct FTC to provide a proposed form of judgment on damages within twenty (20) days from the date of this Order.

**V.  CONCLUSION**

IT IS THEREFORE ORDERED that the Motion for Summary Judgment and/or to Dismiss by Defendant Kyle Kimoto (Doc. #155) is hereby DENIED.

IT IS FURTHER ORDERED that the Motion for Summary Judgment by Defendant Global Fulfillment, Inc. (Doc. #266) is hereby DENIED.

IT IS FURTHER ORDERED that the Motion for Summary Judgment by Defendant Dragon Group, Inc. (Doc. #267) is hereby DENIED.

IT IS FURTHER ORDERED that the Motion for Summary Judgment by Defendant MSC Online, Inc. (Doc. #268) is hereby DENIED.

IT IS FURTHER ORDERED that the Motion for Summary Judgment by Defendant Global Gold Limited (Doc. #269) is hereby DENIED.

IT IS FURTHER ORDERED that the Motion for Summary Judgment by Defendants Acai, Inc.; Healthy Allure, Inc.; and Total Health, Inc. (Doc. #270) is hereby DENIED.

IT IS FURTHER ORDERED that the Motion for Summary Judgment by Defendants Allclear Communications, Inc.; Elite Benefits Group, Inc.; Global Gold, Inc.; Steven R. Henriksen; Premier Plus Member, Inc.; and Vcomm, Inc. (Doc. #272) is hereby DENIED.

IT IS FURTHER ORDERED that the Motion for Summary Judgment by Defendant Paid to Process, Inc. (Doc. #273) is hereby DENIED.

IT IS FURTHER ORDERED that the Motion Under Rule 201 (Doc. #314) is hereby DENIED.

///

1    IT IS FURTHER ORDERED that the Motion for Summary Judgment by Plaintiff

2  Federal Trade Commission (Doc. #275) is hereby GRANTED in part and DENIED in part

3  as set forth in this Order.

4    IT IS FURTHER ORDERED that Plaintiff Federal Trade Commission shall

5  provide a proposed form of judgment reflecting monetary damages within twenty (20) days

6  from the date of this Order.

7

8  DATED: October 25, 2011

9    _____
     PHILIP M. PRO
10   United States District Judge